IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RYAN deM. JENNINGS,

    *Plaintiff*,

v.

FROSTBURG STATE
UNIVERSITY, *et al*.,

    *Defendants*.

Civil No. ELH-21-656

**MEMORANDUM OPINION**

Plaintiff Ryan deM. Jennings, Ph.D., a disabled biology professor, was hired to teach at

Frostburg State University ("FSU" or "Frostburg").  After his contract was not renewed, Jennings

filed an employment discrimination action against five defendants: Frostburg, a public institution

of higher learning; the Board of Regents, University System of Maryland (the "Board"); the

University System of Maryland ("USM"); the State of Maryland (the "State"); and the president

of Frostburg, Ronald H. Nowaczyk, Ph.D., in his individual and official capacities.  *See* ECF 2

(the "Complaint").[1]  Plaintiff alleges that he is non-ambulatory but able to perform the essential

functions of his job as an Assistant Professor in Biology.  *Id.* ¶¶ 10, 11, 14.

The Complaint asserts claims for disability discrimination (Counts I and II); retaliation

(Counts III and IV); and failure to accommodate (Counts V and VI).  The claims are lodged under

Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, as well as the Maryland

---

[1] Suit was initially filed in the Circuit Court for Allegany County, Maryland.   Defendants
removed the case to federal court on March 16, 2021, pursuant to 28 U.S.C. §§ 1331, 1441.  *See*
ECF 1 ("Notice of Removal").  Subject matter jurisdiction is founded on 28 U.S.C. § 1331, as to
plaintiff's Rehabilitation Act claim.  ECF 1, ¶ 3.  And, the Court has "supplemental jurisdiction
over the state law causes of action pursuant to 28 U.S.C. §1367."  *Id.*

Fair Employment Practices Act ("MFEPA"), Md. Code (2020 Repl. Vol.) §§ 20-601 *et seq.* of the State Government Article ("S.G."). *See* ECF 2, ¶¶ 29–98. Jennings seeks monetary damages, inclusive of back pay, back benefits, and compensatory damages, as well as "pre- and post-judgment interest, reasonable attorney's fees, expert witness fees, and costs." ECF 2 at 12.[2] In addition, Jennings seeks reinstatement or, in the alternative, an award of "front pay and front benefits." *Id.*

Defendants previously filed a "Partial Motion to Dismiss." ECF 12. By Memorandum Opinion (ECF 20) and Order (ECF 21) of December 16, 2021, I granted the motion, in part, dismissing President Nowaczyk in his individual capacity. However, President Nowaczyk remains a defendant in his official capacity. Defendants' Answer to the Complaint followed on January 31, 2022. ECF 26.

On January 27, 2023, defendants filed a "Motion for Leave to Amend Answer" (ECF 54), supported by a memorandum (ECF 54-1) (collectively, the "Motion to Amend"), asking the Court to permit them to "amend their answer to add as an affirmative defense that Plaintiff failed to exhaust his administrative remedies" for his failure to accommodate claim under MFEPA (Count V). ECF 54-1 at 1. The Motion to Amend is supported by two exhibits. *See* ECF 54-2; ECF 54-3. Plaintiff opposes the Motion to Amend (ECF 81), and defendants have replied (ECF 97).

Defendants also filed a motion for summary judgment (ECF 55), supported by a memorandum (ECF 55-1) (collectively, the "Summary Judgment Motion"). The Summary Judgment Motion is supported by forty exhibits. *See* ECF 55-4 through 55-43. Plaintiff opposes the Summary Judgment Motion (ECF 82, "Opposition"), and submitted sixty-four exhibits. *See*

---

[2] Throughout this Memorandum Opinion, I cite to the electronic pagination of the parties' filings, which does not always correspond to the page number imprinted on a submission.

ECF 82-4 through 82-67.  Plaintiff filed his memorandum (ECF 83-1) and various exhibits (ECF 83-2 through 83-15) under seal.  Although the exhibits remain under seal, plaintiff filed a redacted copy of his memorandum in support of the Summary Judgment Motion, excluding from public view only information that is properly sealed.  ECF 100-1.  Defendants have replied.  ECF 91.

In addition, plaintiff has filed a "Motion for Sanctions for Spoliation" (ECF 62), supported by a memorandum (ECF 62-1) (collectively, the "Motion for Sanctions").  It is accompanied by five exhibits.  ECF 62-2 through 62-6.  Plaintiff alleges that, on December 14, 2022, just before the close of discovery, "Defendants provided Plaintiff with an Affidavit indicating that they, by their own admission, had destroyed evidence pertinent to this case," referring to text messages stored on the respective FSU-issue cell phones of Dr. Dorothy Campbell and Dr. Elizabeth Throop.  ECF 62-1 at 1.  Defendants oppose the Motion for Sanctions.  ECF 85.  Plaintiff has replied.  ECF 88.

The record is voluminous.  Plaintiff points out that discovery yielded "nearly 1,600 pages of deposition testimony" and "more than 15,000 pages of documents."  ECF 83-1 at 1.  In sum, the parties' exhibits total almost 1,200 pages.  *See* ECF 55; ECF 82; ECF 83; ECF 91.

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny defendants' Motion to Amend (ECF 54); grant in part and deny in part defendants' Summary Judgment Motion (ECF 55); and deny plaintiff's Motion for Sanctions (ECF 62).

## I.    Factual Background[3]

Frostburg is a public institution of higher education and a constituent institution of the USM.  Md. Code (2022 Repl. Vol.), § 12-101(b)(6)(vii) of the Education Article.  Nowaczyk has been President of FSU at all relevant times.  ECF 82-6 (Defendants' Answers to Plaintiff's Interrogatories) at 4.

Jennings received his Ph.D. in Ecology and Environmental Sciences from Montana State University in 2015.  ECF 82-13 (Jennings FSU Application) at 4.  From 2015 until 2017, when plaintiff commenced work at Frostburg, Jennings held a Visiting Assistant Professor position at Mercer University, where he taught several courses in biology.  *Id.*

In May 2017, defendants hired plaintiff as a full-time, tenure-track Assistant Professor in Biology.  *See* ECF 82-17 (Employment Confirmation Letter).   His position began on August 16, 2017.  ECF 82-18 (Employment Agreement).  Jennings has "Spinal Muscular Atrophy" and is non-ambulatory, requiring him to use a customized power wheelchair.  ECF 82-7 (Plaintiff's Answers to Defendants' Interrogatories) at 11.  Nevertheless, Jennings alleges that, at all relevant times, he "could perform the essential functions of his job, with or without a reasonable accommodation."  ECF 2, ¶ 14; *see also id.* ¶¶ 10, 11.

Jennings moved to Maryland from Macon, Georgia to take the position at Frostburg.  ECF 82-12 (Jennings Dep.) at 54.  He testified that he "had to purchase and remodel a home to make it wheelchair accessible" (*id.*) and estimates that the renovations cost "in excess of $30,000."  ECF

---

[3] As discussed, *infra*, at summary judgment I must view all facts, including any reasonable inferences to be drawn from them, in the light most favorable to plaintiff as the nonmoving party.

In the Factual Background, I restate much of the factual summary set forth in my Memorandum Opinion of December 16, 2021 (ECF 20), and then supplement it, where appropriate.  However, I have added citations to the record, in lieu of citations to the Complaint.

82-7 (Plaintiff's Answers to Defendants' Interrogatories) at 8.  His first-year salary at Frostburg was $56,500.  ECF 55-11 (Employment Agreement) at 2.

Plaintiff claims that his time at FSU was marked by several "achievements."  ECF 2, ¶ 13.  For example, Jennings "was awarded a PELEF grant ($1400)," mentored "multiple students in Independent Research (BIOL 499)," "was a co-author on a published, peer reviewed paper," and "joined multiple committees on campus and within the greater Frostburg community."  ECF 91-16 (Jennings Second Year Evaluation) at 5.  Jennings also served on the "Faculty Workload and Compensation Subcommittee," as well as "the Americans with Disabilities Act (ADA) and Equal Employment Opportunity (EEO) Advisory Group"; acted as the "Department Recording Secretary" for the Biology Department (the "Department"); "taught greater than a full load of course credit hours"; and "led a research program that included undergraduate research students and a cross-disciplinary collaborator in [FSU's] Geography Department."  ECF 82-7 (Plaintiff's Answers to Defendants' Interrogatories) at 11.  In addition, Jennings served "the community at large on the Board of Directors for the Resources for Independence Center for Independent Living in Cumberland."  *Id.*

About sixteen months after plaintiff commenced work at FSU, President Nowaczyk sent Jennings a letter dated December 13, 2018, informing him that his contract with FSU would not be renewed.  *See* ECF 55-36 (President Nowaczyk Letter).  Further, plaintiff was told that his employment with FSU would end on May 23, 2019.  *Id.*

According to Jennings, the events leading to his termination began in the fall of 2017.  ECF 2, ¶ 16.  Jennings began communicating requests for accommodations when he began working at Frostburg.  *See* ECF 82-7 (Plaintiff's Answers to Defendants' Interrogatories) at 12; ECF 82-20 (Accommodations Request E-mail).  In particular, beginning in the fall of 2017, he requested the

installation of power door openers for his lab and for the restroom. *See* ECF 82-19 (Puthoff Accommodations E-mail); ECF 82-20 (Accommodations Request E-mail); ECF 82-21 (FSU Accommodation Request Form). Jennings testified that the door to the lab room where he taught was "a heavy and hard door," and that although on some days he "managed to be able to bust it open on [his] own," he generally required the assistance of his students or lab assistant to access the room. ECF 82-12 (Jennings Dep.) at 14. He often kept the door open because "otherwise [he] couldn't even be in the workspace," but "would be criticized" by other faculty members for doing so. ECF 82-12 (Jennings Dep.) at 15–16.

Defendants did not install the power door openers. *See* ECF 55-1 at 29. But, Jennings asserts, and defendants do not dispute, that the requests were never formally denied. *See* ECF 82-12 (Jennings Dep.) at 20.

Frostburg uses an evaluative process to determine whether to renew the contracts of full-time, tenure-track Assistant Professors. *See* ECF 55-19 (FSU Faculty Handbook) at 19. The evaluation procedure for first-year faculty is essentially the same as for second-year faculty, but takes place during a different time frame. *Id.* at 21. For second-year faculty, the process begins on October 30, when the Department Chair sends the Department's recommendation of renewal or nonrenewal to the faculty member. *Id.* The faculty member may send a written rebuttal to the Dean, opposing the Department's recommendation, and the Dean then sends a recommendation to the Provost and to the faculty member. *Id.* The faulty member may then send another written rebuttal, this time to the Provost, if he opposes the Dean's recommendation. *Id.* at 22. Then, the Provost sends a recommendation to the President and informs the faculty member of this recommendation. *Id.* Finally, the President notifies the faculty member of the final renewal decision. *Id.*

During plaintiff's second-year renewal evaluation process, Dorothy I. Campbell, Ph.D. served as the Interim Dean.  ECF 82-6 (Defendants' Answers to Plaintiff's Interrogatories) at 4. Elizabeth A. Throop, Ph.D. served as the Provost.  *Id.*

On January 22, 2018, during plaintiff's first year at FSU, the Department recommended a "provisional renewal" of plaintiff's contract.  ECF 55-24 (Jennings First Year Evaluation) at 5.  A provisional renewal is a "renewal with attached conditions."  *Id.*  Dean Campbell, Provost Throop, and President Nowaczyk accepted the recommendation, and Nowaczyk informed Jennings that his contract would be provisionally renewed.  *See* ECF 55-25 (Campbell First Year Letter); ECF 55-26 (Throop First Year Letter); ECF 55-27 (President Nowaczyk First Year Letter).  However, plaintiff's contract was not renewed following his second-year evaluation, based on the Department's nonrenewal recommendation (ECF 55-29, Jennings Second Year Evaluation), and the subsequent acceptance of the nonrenewal recommendation by Campbell, Throop, and Nowaczyk.  *See* ECF 55-31 (Campbell Letter); ECF 55-35 (Throop Letter); ECF 55-36 (President Nowaczyk Letter).

On November 8, 2018, after Jennings received the Department's evaluation and nonrenewal recommendation, Jennings sent a roughly 60-page rebuttal letter to Dean Campbell. ECF 55-30 (Jennings Rebuttal).  Jennings informed Dean Campbell of his belief that his work did not receive "a full and fair evaluation," noting his perception of "discriminatory practices in employment decisions."  *Id.* at 18.  Jennings stated: "The primary information evaluated in the review of my Teaching are results from student teaching evaluation surveys, which are known to be biased (both numerically and as free-response) against professors who teach a rigorous course and minority faculty."  *Id.* at 6.  He also noted that he falls into both of these categories.  *Id.*

Further, Jennings claimed that his evaluation scores were "nearly a full point higher than the required score for Teaching," as laid out in the Faculty Handbook. *Id.* at 7.

According to Jennings, the emphasis on student reviews created a discriminatory dynamic because "[i]t is known that student perceptions are inherently biased, especially against minority faculty." ECF 55-30 (Jennings Rebuttal) at 12. He asserted that, by "[c]iting data known to be biased as a reason for non-renewal," defendants were "violat[ing] employment laws that protect minorities and people with disabilities." *Id.*[4]

Moreover, Jennings testified that Department members "would talk about how biased . . . student surveys and student feedback can be." ECF 82-12 (Jennings Dep.) at 40. Yet, for his evaluation, they "pretty much exclusively" relied on "whatever any student had said to them about me without doing any investigation or anything." *Id.* He also noted in his rebuttal: "[N]o member of the Department has observed my teaching in person." ECF 55-30 (Jennings Rebuttal) at 12. According to Jennings, his evaluation procedure stood in contrast to the evaluations for other professors. He said: "From my observations of how the Department reviews and renews other faculty, I very much feel that I have been subjected to significantly more scrutiny and higher standards than other members of the Department, both tenured and tenure track." *Id.* at 17.

Additionally, Jennings complained that, in making the nonrenewal decision, defendants took into account that he had not demonstrated particular techniques in his Microbiology lab. *See id.* at 10. He pointed out that it was "the first notification from the Department that these techniques must be demonstrated by the instructor and that they must be part of the course," and complained that such demonstration "is physically not possible for [him] to do," requesting

---

[4] Yet, Jennings recognized that he also received "many positive comments from students." ECF 55-30 (Jennings Rebuttal) at 9.

"reasonable accommodations that would enable [him] to fulfill the obligation." ECF 55-30 (Jennings Rebuttal) at 11. He also stated that, had he known of this requirement, he "would have requested reasonable accommodations" when he first began at FSU. *Id.*

Also on November 8, 2018, Philip Allen, an FSU professor of geography who identified himself as plaintiff's "external mentor," wrote to Dean Campbell in support of plaintiff's appeal of the nonrenewal recommendation. ECF 82-24 (Allen Letter). Allen stated that plaintiff was concerned about the existence of bias in student evaluations, and particularly that this bias may not have been considered during the review process. *Id.* at 1. Allen also noted: "One student, in an open response, commented on [plaintiff's] lack of physical ability." *Id.* at 2. Notwithstanding plaintiff's complaints and concerns, Dean Campbell recommended that plaintiff's contract not be renewed. ECF 55-32 (Campbell Letter).

On November 20, 2018, after Jennings was informed that Dean Campbell accepted the nonrenewal recommendation, Jennings appealed the decision to Provost Throop. ECF 55-33 (Jennings Second Rebuttal). For this appeal, Jennings submitted a short letter and attached the more extensive rebuttal letter he had submitted to Campbell. *See id.* Then, on November 26, 2018, Dr. David Puthoff, the Chair of the Department, e-mailed two colleagues to inform them that Provost Throop planned to overturn the decisions for nonrenewal of plaintiff's contract. ECF 91-7 (Puthoff 11/26/2018 E-mail) at 3. Puthoff also told his colleagues that Throop told him that "there is not an 'in court' defensible position for not renewing [plaintiff's] contract." *Id.* Puthoff wrote that "if [he] want[ed] to try to change her mind it has to be done tomorrow." *Id.* Puthoff also included a draft letter to Throop, in which he stated: "As you know the cohesive functionality of any group is of utmost importance. There has to be some allowance for 'fit.' Technical expertise is not enough when it comes to making a Dept. work." *Id.* at 4.

At his deposition, Puthoff stated that he met with Throop the following day, on November 27, 2018.  ECF 82-9 (Puthoff Dep.) at 69.  Dr. Michael Murtagh, a professor of psychology and a member of FSU's Faculty Concerns Committee, was also in attendance.  ECF 55-9 (Puthoff Dep.) at 15; *see also* ECF 55-1 at 17 (noting that Dr. Murtagh was in attendance and identifying his position at FSU).[5]  Following this meeting, on November 29, 2018, Throop recommended the nonrenewal of plaintiff's contract.  ECF 55-35 (Throop Letter).

Thereafter, on December 5, 2018, plaintiff appealed the nonrenewal recommendations of Dean Campbell and Provost Throop to the "Faculty Appeals Committee."  ECF 82-7 (Plaintiff's Answers to Defendants' Interrogatories) at 12.  On December 13, 2018, President Nowaczyk issued his final decision not to renew plaintiff's contract.  ECF 55-36 (President Nowaczyk Letter).  According to the Complaint, "no decision was ever made by the Committee in relation to [plaintiff's] appeal."  ECF 2, ¶ 24.  Plaintiff's "employment with Frostburg State University" ceased on May 23, 2019.  ECF 55-36 (President Nowaczyk Letter).  Plaintiff remained unemployed until August 2020.  ECF 82-7 (Plaintiff's Answers to Defendant's Interrogatories) at 9.

On March 14, 2019, plaintiff filed a Charge of Discrimination (the "Charge") with the Equal Employment Opportunity Commission ("EEOC") against FSU.  ECF 55-37 (EEOC

---

[5] According to the 2018 FSU Faculty Handbook (ECF 55-19 at 29), the Faculty Concerns Committee has "the responsibility for the Faculty Evaluation Procedures" and is responsible for "review[ing] and approv[ing] exceptions and amendments to the University Evaluation procedures."  Moreover, the 2018 FSU Faculty Handbook states, *id.*:

> The Faculty Concerns Committee will also have the responsibility for ensuring that departments/Library, Department Chairs, and Departmental/Library Evaluation Committees conform to the prescribed evaluation procedures.  Faculty members who believe that procedural violations have occurred should bring those issues to the attention of the Faculty Concerns Committee, which may recommend further action to the Dean/Library Director of the relevant college/library.

Charge).  The Charge was cross-filed with the Maryland Commission on Civil Rights.  *Id.*  The Charge asserted that plaintiff was discriminated and retaliated against on the basis of his disability. *Id.*  A Notice of the Charge was provided by the EEOC to FSU on March 19, 2019.  ECF 85 at 3 ("The EEOC issued notice of the charge to the University on March 19, 2019.")  On March 20, 2019, the EEOC issued a Dismissal and Notice of Rights, advising Jennings that he had 90 days to pursue his claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111 *et seq.*  ECF 55-38 (EEOC Dismissal and Notice of Rights).[6]

Plaintiff filed suit in the Circuit Court for Allegany County (the "State Court") on October 30, 2020 (ECF 2, Complaint).  Defendants removed the case to this Court on March 16, 2021. ECF 1 (Notice of Removal).

Additional facts are included, *infra*.

## II.     Standards of Review

### A.  Amendment of Pleadings

Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, "[a] party may amend its pleading once as a matter of course within: A) 21 days after serving it, or B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."  Fed. R. Civ. P. 15(a)(1).  "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave."  Fed. R. Civ. P. 15(a)(2).  However, Rule 15(a)(2) "provides that courts 'should freely give leave' to parties to amend pleadings 'when justice so requires.'"  *Sohrabi*

---

[6] This suit was filed after the expiration of the 90-day window.  However, plaintiff is not pursuing claims under the ADA.

*v. Mirghahari*, GJH-20-2001, 2023 WL 1416020, at *2 (D. Md. Jan. 31, 2023) (citing Fed. R. Civ. P. 15(a)(2)).

"This liberal rule gives effect to the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006). Ultimately, the decision whether to grant leave to amend a pleading generally falls within the sound discretion of the district court. *Medigen of Ky., Inc. v. Pub. Serv. Comm'n of W.Va.*, 985 F.2d 164, 167–68 (4th Cir. 1993) (citing *Nat'l Bank v. Pearson*, 863 F.2d 322, 327 (4th Cir. 1988)).

The Fourth Circuit has "interpreted Rule 15(a) to provide that 'leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile.'" *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986); *see Equal Rts. Ctr. v. Niles Bolton Assoc.*, 602 F.3d 597, 603 (4th Cir. 2010) (stating that leave to amend may be denied where the proposed amendment "would be prejudicial to the opposing party, or the moving party has acted in bad faith, or the amendment would be futile"); *see also Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 379 (4th Cir. 2012); *Medigen of Ky., Inc.*, 985 F.2d at 168. Thus, "a district court may deny leave if amending the [pleading] would be futile—that is, if the proposed amended [pleading] fails to satisfy the requirements of the federal rules." *Katyle v. Penn Nat'l Gaming, Inc.* 637 F.3d 462, 471 (4th Cir. 2011) (citing *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008)) (alterations added).

Fed. R. Civ. P. 16 concerns scheduling and case management. And, where a party "moves to amend after the deadline established in the scheduling order for doing so, Rule 16(b)(4) becomes

the starting point in the Court's analysis." *Wonasue v. Univ. of Md. Alumni Ass'n*, 295 F.R.D. 104, 106 (D. Md. 2013); *see Faulconer v. Centra Health, Inc.*, 808 F. App'x 148, 152 (4th Cir. 2020).

Rule 16(b)(4) provides: "A schedule may be modified only for good cause and with the judge's consent."  Thus, Rule 16 "recognize[s] . . . that the parties will occasionally be unable to meet . . . deadlines [in a scheduling order] because scheduling order deadlines are established relatively early in the litigation."  *O'Connell v. Hyatt Hotels of Puerto Rico*, 357 F.3d 152, 154 (1st Cir. 2004).

Scheduling orders serve a vital purpose in helping a court to manage its civil caseload. *Gestetner Corp. v. Case Equip. Co.*, 108 F.R.D. 138, 141 (D. Me. 1985); *see also Naughton v. Bankier*, 14 Md. App. 641, 653, 691 A.2d 712, 718 (1997) (recognizing that a scheduling order helps "to maximize judicial efficiency and minimize judicial inefficiency").  To that end, a scheduling order is an important vehicle in "'securing the just, speedy, and inexpensive determination of every action.'"  *Miller v. Transcend Servs., Inc.*, 10 CV 362, 2013 WL 1632335, at *4 (M.D.N.C. Apr. 16, 2013) (quoting *Marcum v. Zimmer*, 163 F.R.D. 250, 253 (S.D.W. Va. 1995)).

Under Rule 16(b)(4), a movant must demonstrate good cause to satisfy the requirement for a modification of the scheduling order.  *See Faulconer*, 808 F. App'x at 152; *Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008); *Wonasue*, 295 F.R.D. at 106–07; *see also United States v. Hartford Accident & Indem. Co.*, No. CV JKB-14-2148, 2016 WL 386218, at *5 (D. Md. Feb. 2, 2016) ("The burden for demonstrating good cause rests on the moving party.").  The

"'touchstone'" of Rule 16(b)(4)'s "good cause requirement is 'diligence.'" *Faulconer*, 808 F. App'x at 152 (citation omitted).

## B. Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *see also Iraq Middle Market Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."). The nonmoving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).

Pursuant to Fed. R. Civ. P. 56(c)(1), where the moving party bears the burden of proof on the issue at trial, he must support his factual assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." But, where the nonmovant bears the burden of proof at trial, the moving party may show that it is entitled to summary judgment by citing to evidence in the record. And, "the burden on the moving party may [also] be discharged by 'showing'—that is, pointing out to the district court—that there is an

absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B).

"Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact." *Brother Convenience Store, Inc. v. U.S. Dep't of Agriculture*, GLR-20-1346, 2021 WL 3911594, at *8 (D. Md. Sept. 1, 2021) (citing *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 586–87). Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)) (alteration in *Bouchat*), *cert. denied*, 541 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322–24. As indicated, the Court must view all of the facts, including any reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587; *accord Roland v. U.S. Citizenship & Immigr. Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841

F.3d 199, 204 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Wilson v. Prince George's Cnty., Md.*, 893 F.3d 213, 218–19 (4th Cir. 2018); *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *See Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Where there is conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

### C. Sanctions for Spoliation of Evidence

Spoliation occurs when a party destroys or materially alters evidence or fails to preserve property that could be used as evidence in a pending or reasonably foreseeable case. *See Boone v.*

16

*Everett*, 751 F. App'x 400, 401 (4th Cir. 2019) (per curiam); *see also Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001).  Federal courts derive the power to sanction spoliation from two sources of authority: Fed. R. Civ. P. 37(e), and the inherent authority to control the judicial process.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–46 (1991); *EEOC v. Performance Food Grp., Inc.*, CCB-13-1712, 2019 WL 1057385, at *2 (D. Md. Mar. 6, 2019) (Gesner, M.J.); *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96, 103–04 (E.D. Va. 2018); *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 517 (D. Md. 2010) (Grimm, M.J.), [7] *aff'd in part, modified in part on other grounds*, MJG-06-2662, 2010 WL 11747756 (D. Md. Nov. 1, 2010).

A court must exercise its inherent authority with restraint.  Therefore, courts typically rely on statutory authority, when applicable.  *See Chambers*, 501 U.S. at 44; *Victor Stanley, Inc.*, 269 F.R.D. at 518.

Rule 37(e) of the Federal Rules of Civil Procedure provides authority for the spoliation of electronically stored information ("ESI").  *See Performance Food Grp.*, 2019 WL 1057385, at *2; *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 505–06 (D. Md. 2009) (Grimm, M.J.).  Fed. R. Civ. P. 37(e) states:

> FAILURE TO PRESERVE ELECTRONICALLY STORED INFORMATION.  If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>> (A) presume that the loss of information was unfavorable to the party;
>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or

---

[7] Judge Grimm was a magistrate judge when he decided *Goodman*.  He subsequently became a District Judge in Maryland.  He recently retired from judicial service.

(C) dismiss the action or enter a default judgment.

Accordingly, in order to obtain sanctions for the spoliation of ESI, the moving party must satisfy four threshold elements: "(1) ESI should have been preserved, (2) ESI was lost, (3) the loss was due to a party's failure to take reasonable steps to preserve the ESI; and (4) the ESI cannot be restored or replaced through additional discovery." *Steves & Sons*, 327 F.R.D. at 104.

### III.   Discussion

### A.   Defendants' Motion to Amend

Defendants seek to amend the Answer (ECF 26) in order to assert an affirmative defense of failure to exhaust administrative remedies as to Count V of the Complaint (ECF 2, ¶¶ 83–89). They explain that their "counsel inadvertently omitted the affirmative defense," and they assert that the omission was discovered while preparing the motion for summary judgment.   ECF 54-1 at 2.   As grounds for the Motion to Amend, defendants rely solely on Rule 15(a).   *See id.*

Defendants filed the Motion to Amend on January 27, 2023, nearly one year after they filed their Answer on January 31, 2022.   *See* ECF 26; *see also* ECF 81 at 1.   And, the Court's Scheduling Order set a deadline of May 2, 2022, to amend pleadings.   ECF 28; *see* ECF 81 at 2.   At the request of the parties, the Court amended the Scheduling Order several times, ultimately extending the deadline to file dispositive motions to January 27, 2023.   ECF 34; ECF 38; ECF 41; ECF 43; ECF 46; ECF 48.   But, at no point did the parties request an extension for the deadline to amend pleadings.   Thus, the Motion to Amend comes not only one year after the filing of the Answer, but eight months beyond the Scheduling Order's deadline to amend pleadings.

Although defendants rely only on Rule 15, the analysis is not governed exclusively by Rule 15.   Defendants must also satisfy the standards of Fed. R. Civ. P. 16, which governs amendment of pleadings filed beyond the deadline set forth in a scheduling order.   As the Fourth Circuit has said, "after the deadlines provided by a scheduling order have passed, the good cause standard"

under Rule 16 "must be satisfied to justify leave to amend the pleadings." *Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008); *see also Cook v. Howard*, 484 F. App'x 805, 814–15 (4th Cir. 2012) (stating that Rule 15(a)(2) "applies . . . prior to the entry of a scheduling order, at which point, under Rule 16(b)(4), a party must first demonstrate 'good cause' to modify the scheduling order deadlines, before also satisfying the Rule 15(a)(2) standard for amendment."); *Odyssey Travel Ctr., Inc. v. RO Cruises, Inc.*, 262 F. Supp. 2d 618, 631 (D. Md. 2003) ("[O]nce the scheduling order's deadline for amendment of the pleadings has passed, a moving party first must satisfy the good cause standard of Rule 16(b); if the moving party satisfies Rule 16(b), the movant then must pass the tests for amendment under [Rule] 15(a).").

In *Nourison*, 535 F.3d at 298, the Fourth Circuit explained:

> There is tension within the Federal Rules of Civil Procedure between Rule 15(a) and Rule 16(b) . . . . Rule 15(a) provides that leave to amend "shall be freely given when justice so requires." A motion to amend should be denied only where it would be prejudicial, there has been bad faith, or the amendment would be futile. *HCMF Corp. v. Allen*, 238 F.3d 273, 276–77 (4th Cir. 2001). On the other hand, Rule 16(b) provides that "a schedule shall not be modified except upon a showing of good cause and by leave of the district judge."

A scheduling order is not a "'frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril.'" *Potomac Elec. Power Co. v. Elec. Motor Supply, Inc.*, 190 F.R.D. 372, 375–76 (D. Md. 1999) (quoting *Gestetner Corp. v. Case Equip. Co.*, 108 F.R.D. 138, 141 (D. Me. 1985)). As noted, scheduling orders serve a vital purpose in helping a court to manage its civil caseload. *Gestetner Corp.*, 108 F.R.D. at 141; *see also Naughton*, 14 Md. App. at 653, 691 A.2d at 718 (noting that a scheduling order helps "to maximize judicial efficiency and minimize judicial inefficiency"). "In an era of burgeoning case loads and thronged dockets, effective case management has become an essential tool for handling civil litigation." *Tower Ventures, Inc. v. City of Westfield*, 296 F.3d 43, 45 (1st Cir. 2002). Thus, as indicated, a scheduling

order is an important vehicle in "'securing the just, speedy, and inexpensive determination of every action.'" *Miller*, 2013 WL 1632335, at *4 (citation omitted).

Modification of a scheduling order requires good cause. Fed. R. Civ. P. 16(b)(4). And, as noted, the "touchstone" of Rule 16(b)(4)'s "good cause requirement is diligence." *Faulconer*, 808 F. App'x at 152 (internal quotation marks omitted). Indeed, "only diligent efforts to comply with the scheduling order can satisfy Rule 16's good cause standard." *Id.* at 152; *see also id.* at 152 n.1 (collecting cases); *accord Rassoull v. Maximus, Inc.*, 209 F.R.D. 372, 374 (D. Md. 2002) ("Lack of diligence and carelessness are 'hallmarks of failure to meet the good cause standard.'") (citation omitted).

In evaluating diligence, courts mainly focus "on the timeliness of the motion to amend 'and the reasons for its tardy submission.'" *Elat v. Ngoubene*, 993 F. Supp. 2d 497, 520 (D. Md. 2014) (quoting *CBX Techs., Inc. v. GCC Techs., LLC*, No. JKB–10–2112, 2012 WL 3038639, at *4 (D. Md. July 24, 2012)). "'Carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief.'" *Wonasue*, 295 F.R.D. at 107 (quoting *CBX Technologies, Inc.*, 2012 WL 3038639, at *4). If, for example, the "moving party knew of the underlying conduct giving rise to a claim but simply failed to raise it in an initial [pleading], then the party" has not acted diligently, and thus "cannot establish good cause under Rule 16." *Faulconer*, 808 F. App'x at 152 (alteration added). In contrast, and of import here, where "'at least some of the evidence needed for a [party] to prove his or her claim did not come to light until after the amendment deadline,' a [party] has 'good cause' for moving to amend at a later date." *Wonasue*, 295 F.R.D. at 107 (quoting *Tawwaab v. Va. Linen Serv., Inc.*, 729 F. Supp. 2d 757, 768 (D. Md. 2010)) (alterations added).

To determine whether the moving party has met its burden to show good cause, a court may also consider "whether the moving party acted in good faith, the length of the delay and its effects, and whether the delay will prejudice the non-moving party." *Elat*, 993 F. Supp. 2d at 520. However, "'[i]f the movant has not been diligent in meeting the scheduling order's deadlines,' then other factors . . . generally will not be considered." *Faulconer*, 808 F. App'x at 152 (quoting *Kmak v. Am. Century Cos., Inc.*, 873 F.3d 1030, 1034 (8th Cir. 2017)); *see also Rassoull*, 209 F.R.D. at 374 ("'If [the moving party] was not diligent, the inquiry should end.'") (citation omitted) (alteration added); *Marcum*, 163 F.R.D. at 254 ("'[T]he focus of the inquiry is upon the moving party's reasons for seeking modification. If that party is not diligent, the inquiries should end.'") (citation omitted).

The Court need not address Rule 15 unless Rule 16 is satisfied. But, if the moving party demonstrates good cause pursuant to Rule 16(b)(4), the movant must then "satisfy the liberal standard of Fed. R. Civ. P. 15(a)." *Humane Soc'y of the U.S. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, DKC-13-1822, 2016 WL 3668028, at *2 (D. Md. July 11, 2016); *see Cook v. Howard*, 484 F. App'x 805, 814–15 (4th Cir. 2012); *Nourison*, 535 F.3d at 298; *Wonasue*, 295 F.R.D. at 106–07.

Defendants make no reference to Rule 16 in their Motion to Amend. *See* ECF 54-1. Construing defendants' submission liberally, they suggest good cause by stating only that "counsel inadvertently omitted the affirmative defense of failure to exhaust administrative remedies as to Count V and discovered the omission as they were preparing their motion for summary judgment." ECF 54-1 at 2. But, this is exactly the sort of lack of diligence that implicates Rule 16.

21

Defendants focus on their assertion that the late filing will not prejudice plaintiff.  ECF 54 at 3.  However, I need not consider prejudice at this stage.  Rather, Rule 16 instructs that the Court focus solely on a showing of "good cause."

In their Reply (ECF 97), defendants claim that the requested amendment "is unnecessary" (*id.* at 1) and is sought "to exercise caution."  *Id.* at 2.  They point out that plaintiff asserted exhaustion in the Complaint (ECF 2, ¶ 9), and defendants' Answer stated: "To the extent a response is required, Defendants lack sufficient information to form a belief as to the truth of the averment, and therefore it is denied."  ECF 26, ¶ 9.  Defendants argue that this denial in the Answer constitutes "a negative defense."  ECF 97 at 2.  Further, they assert, *id.*: "In short, by virtue of specific denials included in Defendants' Answer to the Complaint, Plaintiff has long been on notice that Defendants dispute the allegation that Plaintiff exhausted his administrative remedies."  I am not persuaded.

"Generally speaking, affirmative defenses 'share[ ] the common characteristic of a bar to the right of recovery even if the general complaint were more or less admitted to.'"  *Emergency One, Inc. v. Am. Fire Eagle Engine Co.*, 332 F.3d 264, 271 (4th Cir. 2003) (quoting *Wolf v. Reliance Standard Life Ins. Co.*, 71 F.3d 444, 449 (1st Cir. 1995)) (alteration in *Emergency One*).  Fed. R. Civ. P. 8(c) requires that "a party must affirmatively state any avoidance or affirmative defense" in a responsive pleading.  The purpose of Rule 8(c) is to give the opposing party notice of the affirmative defense and a chance to rebut it.  *Grunley Walsh U.S., LLC v. Raap*, 386 F. App'x 455, 459 (4th Cir. 2010).  Therefore, a party's failure to raise an affirmative defense in the appropriate pleading generally results in a waiver.  However, a waiver of an affirmative defense is not automatic; it requires the opposing party to show prejudice or unfair surprise.  *Peterson v. Airline Pilots Ass'n*, 759 F.2d 1161, 1164 (4th Cir. 1985).

In contrast to an affirmative defense, a negative defense is one that denies or "directly contradict[s] elements of the plaintiff's claim for relief." 5 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1270 (3d ed.).   Although "a failure to raise an affirmative defense in the appropriate pleading results in the loss of that defense," a defendant generally need not raise a negative defense in its answer to avoid waiver.  *RCSH Operations, L.L.C. v. Third Crystal Park Assocs.*, 115 F. App'x 621, 629 (4th Cir. 2004); *see also* Fed. R. Civ. P. 8(c) (listing eighteen avoidances and affirmative defenses); *Nyberg v. Portfolio Recovery Assocs., LLC*, No. 3:15-CV-01175-PK, 2016 WL 3176585, at *3 (D. Or. June 2, 2016) ("Unlike affirmative defenses, negative defenses typically do not have to be pled to avoid waiver.").

Defendants attempt to glaze over these distinctions by recharacterizing the affirmative defense of failure to exhaust as a negative defense.  ECF 97 at 2.  Notably, "there is tension in Federal Rule of Civil Procedure 8 between 8(b) and 8(c) regarding 'avoidance or affirmative defense' under 8(c) as opposed to denials and other defenses under 8(b)." *Lee v. Sixth Mount Zion Baptist Church of Pittsburg*, No. CV 15-1599, 2017 WL 3608140, at *26 (W.D. Pa. Aug. 22, 2017), *aff'd*, 903 F.3d 113 (3d Cir. 2018).  The two categories of defenses are delineated by separate provisions within Rule 8, and negative defenses are subject to looser pleading requirements.

Given the clear differences between the two, an affirmative defense cannot be converted into a negative defense, and thus subject to the lesser pleading requirements of a negative defense, by way of clever pleading.  To put it another way, an affirmative defense and a negative defense are distinct types of defenses.  Moreover, defendants themselves describe the defense of "failure to exhaust administrative remedies" (ECF 54-1 at 1) as an "affirmative defense."  *Id.* at 2–3.

Further, defendants' argument regarding negative defenses was asserted for the first time in their Reply brief.  *See* ECF 97.  "The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered."  *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006) (citing *United States v. Williams*, 445 F.3d 724, 736 n.6 (4th Cir. 2006)); *see also Hunt v. Nuth*, 57 F.3d 1327, 1338 (4th Cir. 1995) (explaining that "courts generally will not address new arguments raised in a reply brief because it would be unfair to the [other party] and would risk an improvident or ill-advised opinion on the legal issues raised") (alteration added); *Grant v. Kijakazi*, No. 1:20CV897, 2022 WL 595135, at *5 (M.D.N.C. Feb. 28, 2022) ("Parties cannot advance new arguments for the first time in a reply brief."), *report and recommendation adopted*, No. 1:20CV897, 2022 WL 981118 (M.D.N.C. Mar. 31, 2022).

Additionally, defendants' explanation of a "negative defense" is not a correct characterization as it applies in this case.  In fact, Rule 9(c) directly addresses this issue.  Fed. R. Civ. P. 9(c) states: "In pleading conditions precedent, it suffices to allege generally that all conditions precedent have occurred or been performed.  But when denying that a condition precedent has occurred or been performed, a party must do so with particularity."  Thus, in order to properly negate plaintiff's assertion that he exhausted his administrative remedies, defendants were required to deny the allegation "with particularity," rather than as a general denial.  Because defendants denied the exhaustion allegation with a general denial (ECF 26, ¶ 9), they did not properly negate it pursuant to Rule 9(c).

Nevertheless, defendants did not raise failure to exhaust administrative remedies as an affirmative defense in the Answer.  *See* ECF 26.  As noted, the failure to raise an affirmative defense "in the appropriate pleading," generally "results in the loss of that defense."  *RCSH*

*Operation*s, 115 F. App'x at 629.  However, the opposing party is still required to demonstrate prejudice or unfair surprise before a district court may enforce the waiver.  *See id.*  Thus, "[a]bsent unfair surprise and prejudice to a plaintiff . . . a defendant may raise an affirmative defense for the first time in a dispositive pre-trial motion."  *Babb v. Lee Cnty. Landfill SC, LLC*, 298 F.R.D. 318, 323 (D.S.C. 2014); *see Raap*, 386 F. App'x at 459 ("[I]t is well established that an affirmative defense is not waived absent unfair surprise or prejudice.") (citation omitted).  This is because "'[t]he Supreme Court has held that the purpose of Rule 8(c) is to give the opposing party notice of the affirmative defense and a chance to rebut it.'"  *Raap*, 386 F. App'x at 459 (quoting *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1445 (6th Cir. 1993)).

"Although the summary judgment phase may not be the most appropriate time for raising this affirmative defense . . . [a] defendant does not waive an affirmative defense if it is raised at a 'pragmatically sufficient time,' and the plaintiff is not prejudiced."  *Cornell v. Council of Unit Owners Hawaiian Vill. Condominiums, Inc.*, 983 F. Supp. 640, 643 (D. Md. 1997) (quoting *Charpentier v. Godsil*, 937 F.2d 859, 864 (3d Cir. 1991)).  Indeed, the Fourth Circuit has acknowledged that "[c]ourts have found that affirmative defenses raised for the first time in summary judgment motions may provide the required notice."  *Raap*, 386 F. App'x at 459.

Accordingly, I must determine whether Jennings has demonstrated that he will suffer "unfair surprise or prejudice" if defendants are permitted to raise the affirmative defense of failure to exhaust administrative remedies as to Count V of the Complaint.  *See id.*  In this regard, Jennings contends, ECF 81 at 2:

> The absence of this affirmative defense from Defendants' Answer allowed Dr. Jennings to assume that the defense was waived, need not be explored in discovery, and would otherwise have no impact on the litigation of the case.  Had the defense been asserted, Dr. Jennings could have factored it into his litigation strategy, discovery, and even, frankly, its implications in settlement negotiations.

But, this alone does not suffice to demonstrate prejudice or unfair surprise.  First, as discussed, Jennings himself raised the issue of exhaustion in the Complaint (ECF 2, ¶ 9) and defendants answered the allegation with a general denial (ECF 26, ¶ 9).  Although the general denial is insufficient for the purpose of properly raising an affirmative defense, plaintiff became aware that exhaustion may be raised as a dispositive matter.  *See Miller v. Manning*, No. 6:17-CV-1898-TMC-KFM, 2019 WL 3503410, at *4 (D.S.C. July 3, 2019) (finding that because "the plaintiff himself raised the issue of exhaustion in his complaint" and the defendant "answered the allegations of these paragraphs with a general denial," among other things, "plaintiff cannot now claim that he was surprised that exhaustion was raised, nor that he suffered prejudice as a result"), *report and recommendation adopted*, No. 6:17-CV-1898-TMC, 2019 WL 3495946 (D.S.C. Aug. 1, 2019).

As the Fourth Circuit described: "[W]e are left with plaintiffs who suffered little (if any) prejudice and a defendant who has no excuse for its conduct."  *Bryant Real Est., Inc. v. Toll Bros., Inc.*, 106 F. App'x 182, 187 (4th Cir. 2004).  Indeed, "[w]hile it is true that a defendant who seeks to introduce an affirmative defense at the last minute will usually find himself in a perilous position," Jennings has not made the required showing of prejudice or unfair surprise.  Accordingly, I find that "although it would have been preferable for all concerned if the [defendants] had raised" the affirmative defense in their Answer, defendants have not waived the defense that plaintiff failed to exhaust his administrative remedies as to Count V.  *Papesh v. Am. Nat'l Can Co.*, 177 F.R.D. 344, 346 (D. Md.), *aff'd*, 129 F.3d 117 (4th Cir. 1997).  Thus, the Court shall consider defendants' arguments on summary judgment concerning exhaustion of administrative remedies.  But, I shall deny defendants' Motion to Amend.

## B.  Summary Judgment Motion

In the Summary Judgment Motion, defendants assert that "discovery has revealed that all employment decisions" concerning plaintiff, including the decision of nonrenewal, "were based on legitimate nondiscriminatory reasons."  ECF 55-1 at 3.  Moreover, defendants contend that plaintiff's discrimination and retaliation claims are "premised upon vague and unsupported conjecture and suspicion concerning the motivations of University faculty members," and that the failure to accommodate claims are untimely and violate MFEPA's exhaustion requirement.  *Id.*

Before addressing defendants' contentions, I pause to note that even a cursory review of the briefing demonstrates the breadth of material factual disputes.  The parties' respective arguments rely heavily on depositions and alleged conflicting statements therein, which implicate the core issue of witness credibility—an issue that is not properly resolved at the summary judgment stage.  *See Jacobs*, 780 F.3d at 569; *French*, 499 F.3d at 352.  In my view, these factual disputes preclude entry of summary judgment as to most of the claims asserted in the Complaint. *See generally* ECF 55-1; ECF 83-1; ECF 91.

Summary judgment is not a tool to litigate factual disputes.  Defendants' disagreement with plaintiff's evidence "does not give me the right to take the issue away from the trier of fact." *Preston v. Morton*, No. 4:09CV00030, 2010 WL 2036112, at *2 (W.D. Va. May 24, 2010). Indeed, "unless 'reasonable minds could not differ'" over these factual disputes, "the issue is inappropriate for summary judgment."  *Id.* at 3.  I shall address below several of the disputes of material fact that preclude summary judgment.

### 1. Discrimination Claims (Counts I and II)

Plaintiff's discrimination claims arise under two statutes: (1) MFEPA, S.G. §§ 20-601 *et seq.* (Count I) and (2) Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (Count II).  *See* ECF 2, ¶¶ 29–64.

### a. The Rehabilitation Act

Section 504 of the Rehabilitation Act provides, in relevant part: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity." 29 U.S.C. § 794(a).  "'[P]rogram or activity' means all the operations of," *inter alia*, "a department, agency, special purpose district, or other instrumentality of a State or of a local government" or "a college, university, or other postsecondary institution, or a public system of higher education . . . any part of which is extended Federal financial assistance." *Id.*  Defendants do not dispute that they fall within the purview of this statute.

Plaintiff has not sued under the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 *et seq.* ("ADA").  But, § 504 of the Rehabilitation Act is closely related to Title II of the ADA.  Title II of the ADA, 42 U.S.C. § 12133, explicitly provides that "[t]he remedies, procedures, and rights" provided under § 504 of the Rehabilitation Act "shall be the remedies, procedures, and rights [that Title II of the ADA] provides to any person alleging discrimination on the basis of disability."  Indeed, the two statutes "share the same definitions of disability." *Rogers v. Dept. of Health & Env't Control*, 174 F.3d 431, 433 (4th Cir. 1999).  And, to "the extent possible, [courts] construe similar provisions in the two statutes consistently." *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 214 (4th Cir. 2002); *see Seremeth v. Board of Cnty. Commr's of*

*Frederick Cnty.*, 673 F.3d 333, 336 n.1 (4th Cir. 2012) ("Claims under the ADA's Title II and the Rehabilitation Act can be combined for analytical purposes because the analysis is 'substantially the same.'") (citation omitted); *Rogers*, 174 F.3d at 433–34 (stating that courts may apply ADA precedent in interpreting the Rehabilitation Act, and vice versa).  Moreover, the Rehabilitation Act incorporates the standards used to analyze claims brought under the ADA.  *See Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995).  Therefore, reference to the ADA may be helpful for guidance.

Title II of the ADA prohibits public entities, including any State government or instrumentality of the State, from discriminating against a qualified individual with a disability. 42 U.S.C §§ 12131(1), 12132.  Like claims under the ADA, claims brought under the Rehabilitation Act may be established by way of the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Hannah P. v. Coats*, 916 F.3d 327, 342 (4th Cir. 2019) (first citing *Laber v. Harvey*, 438 F.3d 404, 430 (4th Cir. 2006), then citing *Perry v. Computer Scis. Corp.*, 429 F. App'x 218 (4th Cir. 2011)).

The *McDonnell Douglas* proof scheme applies when the plaintiff presents indirect evidence of discrimination.  *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).  It is "a procedural device, designed only to establish an order of proof and production" at trial.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted).  Moreover, it is intended to be flexible, "not onerous," and pertains to uncover "circumstances which give rise to an inference of unlawful discrimination."  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Under the *McDonnell Douglas* test, the plaintiff must first establish a "prima facie case of discrimination."  *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Abilt v. Cent. Intelligence Agency*, 848 F.3d 305, 315 (4th Cir. 2017).  Although the precise

formulation of the prima facie factors will vary in "differing factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, it "is 'not intended to be an inflexible rule.'" *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 228 (2015) (citation omitted).  And, even under the *McDonnell Douglas* approach, the "'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *Burdine*, 450 U.S. at 253); *see also Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 726 (4th Cir. 2019); *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011).

If a plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action.  *Hoyle*, 650 F.3d at 336; *see Reeves*, 530 U.S. at 142; *Hurst v. District of Columbia*, 681 F. App'x 186, 189–90 (4th Cir. 2017) (per curiam).  "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255.  In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510–11.  The plaintiff must then prove, by a preponderance of evidence, "that the [employer's] proffered reason was not the true reason for the employment decision" and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516–20; *Adams v. Trs. of Univ. of N.C.–Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove 'both that the reason was false, and that discrimination was the real

reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in *Adams*).

To state a prima facie case for discrimination under the Rehabilitation Act, a plaintiff must show that: (1) he is disabled; (2) he was otherwise qualified for the position; and (3) he suffered an adverse employment action *solely* on the basis of the disability. *Perry*, 429 F. App'x at 219–20 (4th Cir. 2011) (emphasis added) (citing *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005)); *see also Nat'l Fed. of the Blind v. Lamone*, 813 F.3d 494, 502–03 (4th Cir. 2016); *Baird v. Rose*, 192 F.3d 462, 467–70 (4th Cir. 1999); *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264–65 & n.9 (4th Cir. 1995).

Notably, the Rehabilitation Act requires that a plaintiff's disability be the "sole" reason for the adverse employment action, rather than one of several motivating factors. *See Baird*, 192 F.3d at 468–70.  "Unlike Title VII cases, where race or sex will almost never be an acceptable reason for an employment decision adverse to a qualified employee, the Rehabilitation Act permits an employer to make a decision because of a handicap if the handicap is not the sole reason for the decision." *Burns v. City of Columbus, Dep't of Pub. Safety, Div. of Police*, 91 F.3d 836, 841 (6th Cir. 1996).

However, at the prima facie stage, Section 504's requirement that a plaintiff demonstrate disability as the "sole" basis for an adverse action is difficult to square with the notion that, in general, "[p]roving a prima facie case is a 'relatively easy' burden." *Figueroa v. Geithner*, 711 F. Supp. 2d 562, 573 (D. Md. 2010) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959–60 (4th Cir. 1996) (Title VII case)).  Judge J. Frederick Motz of this court aptly described the tension in *Figueroa*, 711 F. Supp. 2d at 573:

> Some courts . . . describe the *prima facie* case of disability discrimination under the Rehabilitation Act as the Fourth Circuit seems to have described it in *Brockman v.*

31

*Snow*: "To make a prima facie case of disability discrimination, [plaintiff] must prove that: (1) she has a disability under the RA; (2) she is qualified for the employment in question; and (3) she suffered an adverse employment action due to discrimination on the basis of disability." 217 Fed.Appx. 201, 208 (4th Cir. 2007). In my opinion, this is not an accurate description of the *McDonnell Douglas prima facie* test. If a plaintiff shows "an adverse employment action due to discrimination on the basis of disability," then the plaintiff would have already established unlawful discrimination, and the second and third steps of *McDonnell Douglas*—proffering legitimate reasons and determining pretext—would be irrelevant. Further, *Brockman* cites *Doe v. Univ. of Maryland Med. Sys. Corp.*, 50 F.3d 1261, 1265 (4th Cir. 1995) to support this description, but page 1265 in *Doe* does not appear to describe the *prima facie* case under *McDonnell Douglas*.

To my knowledge, the Fourth Circuit has not recently addressed the contours of the third prong in the prima facie context. But, the Sixth Circuit has said that requiring a plaintiff to demonstrate that the adverse employment decision occurred "'solely by reason of [his] disability' . . . imposes too great of a burden upon the plaintiff at this early stage of the *McDonnell Douglas* inquiry." *Jones v. Potter*, 488 F.3d 397, 406 (6th Cir. 2007) (quoting *Peltier v. United States*, 388 F.3d 984 (6th Cir. 2004)) (alteration in *Jones*).  In the view of the *Jones* Court, to conclude otherwise would result in the "conflation of a plaintiff's prima facie burden with his ultimate burden of prevailing under the Rehabilitation Act" and would render the *McDonnell Douglas* framework useless.  *Id.*

"An inference that the adverse action occurred 'solely by reason of' the plaintiff's disability, in short, is *the result* of the prima facie test, not an element of it." *Id.* (emphasis in *Jones*).  The *Jones* Court explained, *id.*: "If the law were otherwise, the *McDonnell Douglas* framework would serve virtually no purpose in cases brought pursuant to the Rehabilitation Act and other single-motive statutes."  Instead, the Sixth Circuit maintains that the requisite showing is made when "'the employer has no reason left to rely on to justify its decision other than the employee's disability[.]'"  *Mitchell v. U.S. Postal Serv.*, 738 F. App'x 838, 848 (6th Cir. 2018) (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173 (6th Cir. 1996)) (alteration in *Mitchell*),

*abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012)).

Similarly, district courts within the Eleventh Circuit have acknowledged that "'if a plaintiff has proved that he was discriminated against because of his disability, he has actually proved his entire case (and he is entitled to have judgment entered in his favor), not simply made a prima facie showing.'" *Booth v. Houston*, 58 F. Supp. 3d 1277, 1296 (M.D. Ala. 2014) (quoting *Brandon v. Lockheed Martin Aeronautical Sys.*, 393 F. Supp. 2d 1341, 1345 (N.D. Ga. 2005)). In *Brandon*, the district court observed, 393 F. Supp. 2d at 1346: "Despite the way that the Eleventh Circuit has articulated this prong of the test, that court has never applied the prong as stated." Rather, "the Eleventh Circuit has simply required a plaintiff to present facts from which an inference of discrimination can be made (as is true in all other discrimination cases)." *Id.*; *accord Booth*, 58 F. Supp. 3d at 1296.

District courts in the Second Circuit have also concluded that, under the Rehabilitation Act, a plaintiff has only a "de minimis burden" at the prima face stage, which requires him only to demonstrate circumstances "giving rise to an inference of discrimination." *Kleyman v. SUNY Downstate Med. Ctr.*, No. 18-CV-3137 (PKC) (ST), 2020 WL 5645218, at *15 (E.D.N.Y. Sept. 21, 2020) (quoting *Schneider v. Wal-Mart Stores, Inc.*, No. 16-CV-2010 (NSR), 2019 WL 294309, at *4 (S.D.N.Y. Jan. 23, 2019)). Such evidence may include "preferential treatment of employees similarly situated to the plaintiff who are not members of the plaintiff's protected class." *Schneider*, 2019 WL 294309, at *4; *accord Conklin v. U.S. Immigr. & Customs Enf't*, No. 1:20-CV-08178-LTS, 2023 WL 2537665, at *10 (S.D.N.Y. Mar. 16, 2023). Moreover, district courts in the Second Circuit have concluded that "'[d]isparate treatment between similarly situated employees gives rise to a presumption of discriminatory intent.'" *Conklin*, 2023 WL 2537665, at

*10 (quoting *Edwards v. Wilkie*, No. 16-CV-8031-LTS-OTW, 2020 WL 2792997, at *9 (S.D.N.Y. May 29, 2020)) (internal quotation marks omitted).

The Supreme Court has clarified that "[t]he prima facie case method established in *McDonnell Douglas* was 'never intended to be rigid, mechanized, or ritualistic.'" *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (quoting *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577 (1978)). "'Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'" *Id.* (quoting *Furnco Construction Corp.*, 438 U.S. at 577).

Thus, "[w]here a defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case," such as proffering a nondiscriminatory reason for the adverse action, "whether the plaintiff did [make a prima facie case] is no longer relevant." *Aikens*, 460 U.S. at 715 (alteration added). This is because "[t]he district court has before it all the evidence it needs to decide whether 'the defendant intentionally discriminated against the plaintiff.'" *Id.* (quoting *Burdine*, 450 U.S. at 253); *see also Cong. v. Gruenberg*, No. CV 19-01453 (CKK), 2022 WL 17356878, at *16 (D.D.C. Dec. 1, 2022) ("In fact, the [D.C. Circuit Court] has dictated that this Court 'need not—and should not—decide' whether plaintiff has made out a prima face case at [the summary judgment] stage.") (quoting *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)). "In other words, the Court must determine if the plaintiff has produced enough evidence such that a reasonable jury would find that the [defendant's] non-discriminatory reasons are mere pretext for underlying unlawful discrimination." *Perry v. Donovan*, 733 F. Supp. 2d 114, 118 (D.D.C. 2010) (alteration added).

### b.  MFEPA

MFEPA "is the state law analogue of Title VII."  *Alexander v. Marriott Int'l, Inc.*, RWT-09-02402, 2011 WL 1231029, at *6 (D. Md. Mar. 29, 2011); *see also Haas v. Lockheed Martin Corp.*, 396 Md. 469, 483 n.8, 914 A.2d 735, 743 n.8 (2007).[8]  S.G. § 20-606(a)(1) specifies, in pertinent part, that "an employer may not . . . (1) fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of . . . the individual's . . . disability . . . ."  In addition, S.G. § 20-606(a)(3) bars an employer from "fail[ing] or refus[ing] to make a reasonable accommodation for the known disability of an otherwise qualified employee."

A claim under MFEPA is also analyzed under the *McDonnell Douglas* burden-shifting framework, in line with claims under Title VII.   For MFEPA claims, a prima facie case of disability discrimination requires an employee to show: "(1) that he or she had a disability; (2) that notwithstanding the disability, he or she was otherwise qualified for the employment, with or without reasonable accommodation; and (3) that he or she was excluded from employment on the basis of his or her disability."  *Peninsula Reg'l Med. Ctr. v. Adkins*, 448 Md. 197, 239, 137 A.3d 211, 236 (2016)

Notably, the first and second factors of the prima facie case are the same under the Rehabilitation Act and MFEPA.  However, the third factor bears an important difference: under

---

[8] Maryland courts interpreting MFEPA have often found federal cases arising under Title VII to be persuasive authority.  *See, e.g.*, *Taylor v. Giant of Md., LLC*, 423 Md. 628, 652, 33 A.3d 445, 459 (2011); *Molesworth v. Brandon*, 341 Md. 621, 632–33, 672 A.2d 608, 614 (1996); *Chappell v. S. Md. Hosp., Inc.*, 320 Md. 483, 494, 578 A.2d 766, 772 (1990); *Edgewood Mgmt. Corp. v. Jackson*, 212 Md. App. 177, 200 n.8, 66 A.3d 1152, 1166 n.8 (2013).  "There are relatively few appellate decisions interpreting Maryland's FEPA," so courts in the state have been guided by federal courts' interpretation of Title VII to analyze claims under the state's analogue law.  *Peninsula Reg'l Med. Ctr. v. Adkins*, 448 Md. 197, 209, 137 A.3d 211, 217–18 (2016); *see Schwenke v. Ass'n of Writers & Writing Programs*, 510 F. Supp. 3d 331, 335 (D. Md. 2021).

the Rehabilitation Act, a plaintiff must demonstrate that the "sole basis" of the adverse action was his disability, whereas MFEPA's "on the basis of" standard is more relaxed and permits mixed-motive arguments.  Thus, if plaintiff satisfies his burden under the Rehabilitation Act, he will have fulfilled the requirements of MFEPA as well.  Accordingly, I shall first analyze the discrimination claim brought pursuant to Section 504 of the Rehabilitation Act.

Defendants have asserted various explanations for the nonrenewal decision, unrelated to plaintiff's disability.  ECF 55-1 at 21–22.  Thus, the prima facie case and pretext analysis collapse into a single analysis.  *See Aikens*, 460 U.S. at 715.  "To establish pretext, a plaintiff must present evidence to allow a reasonable juror to find that (1) the legitimate, nondiscriminatory reasons were 'unworthy of credence' and (2) unlawful discrimination was the actual motive for the decision." *Figueroa*, 711 F. Supp. 2d at 573 (quoting *Reeves*, 530 U.S. at 143); *see also Congress v. Gruenberg*, No. CV 19-01453 (CKK), 2022 WL 17356878, at *16 (D.D.C. Dec. 1, 2022) ("A plaintiff may make this showing of pretext by relying on '(1) evidence establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer.'") (quoting *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006)).

A plaintiff may demonstrate that the employer's proffered reasons are unworthy of credence "'by showing that [they] had no basis in fact, [they] did not in fact motivate the discharge, or, if they were factors in the decision, they were jointly insufficient to motivate the discharge.'" *Figueroa*, 711 F. Supp. 2d at 573–74 (quoting *Maddox v. Univ. of Tenn.*, 62 F.3d 843, 849 (6th Cir. 1995), *abrogated on other grounds by Lewis*, 681 F.3d 312) (alterations in *Figueroa*).  And, "proof that the proffered reasons were false may serve as circumstantial evidence of such

36

discrimination." *Figueroa*, 711 F. Supp. 2d at 574 (citing *Reeves*, 530 U.S. at 147). "The probative value of falsity varies depending on whether there are alternative non-discriminatory (but non-proffered) explanations and the strength of the evidence establishing falsity," and, "[i]n some cases, falsity coupled with the evidence establishing the plaintiff's prima facie case will suffice to support a finding of unlawful discrimination." *Id.* at 574–75 (citing *Reeves*, 530 U.S. at 148); *accord Gruenberg*, 2022 WL 17356878, at *16 ("[A] plaintiff's discrediting of an employer's stated reason for its employment decision is entitled to considerable weight . . . and this Court does not require plaintiffs to submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment.") (internal citations and quotation marks omitted).

### c.  Discussion

Defendants do not dispute that plaintiff is disabled or that, by issuing a decision of nonrenewal, he suffered an adverse employment action.  ECF 55-1 at 20, 24.  Nor do they dispute that, at least at the time FSU hired Dr. Jennings, he was qualified for the Assistant Professor of Biology position.  *Id.* at 20.  Rather, defendants seek summary judgment based on their contention that there is "no evidence" that the nonrenewal decision was predicated on plaintiff's disability. *Id.* at 21.

In particular, the parties dispute whether: (1) student evaluations are a valid basis for a renewal decision; (2) plaintiff demonstrated improvement on the factors outlined in the provisional renewal evaluation; (3) faculty members actually considered the factors set forth by defendants in deciding not to renew plaintiff's contract; (4) renewal evaluation procedures were properly followed; and (5) the comparators listed by plaintiff are similarly situated for purposes of demonstrating disparate treatment.

As noted, defendants, as the movants, bear the burden of demonstrating the absence of genuine disputes of material fact.  Fed. R. Civ. P. 56(c)(1)(B); *see Celotex Corp.*, 477 U.S. at 325. And, the Court must view all of the facts and reasonable inferences in the light most favorable to plaintiff as the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587.  In my view, there are multiple disputes of material fact that preclude entry of summary judgment.

For example, defendants contend that plaintiff's appointment was not renewed because "the University . . . determined that his teaching performance was unsatisfactory and not meeting student needs."  ECF 55-1 at 18.  Defendants do not dispute plaintiff's assertion that, despite plaintiff's request that someone in the Department personally observe his teaching, "no member of the faculty, from either inside or outside his department, ever conducted a teaching observation." ECF 83-1 at 25 n.24.  Based on the Department's failure to have another teacher observe Jennings, he contends that the only metric by which defendants measured plaintiff's teaching performance was through the use of student evaluations.  Defendants disagree, asserting that "the Department also based its decision not to renew Dr. Jennings's appointment on the lack of guidance in the materials Dr. Jennings submitted for review."  ECF 55-1 at 23.

In their Summary Judgment Motion, defendants focus substantially on the content of student evaluations.  ECF 55-1 at 11–12.  They contend that there is no evidence that the student comments "the Department considered at the time of [plaintiff's] nonrenewal were negative because of bias" based on disability.  *Id.* at 21.  Yet, plaintiff maintains that student evaluations are inherently biased against disabled professors, even where the comments are not facially discriminatory.  And, he complains that, as to him, the Department relied almost exclusively on student evaluations, but did not do so for non-disabled faculty.  Thus, the parties dispute whether

the student evaluations relied upon by the department were implicitly discriminatory.  *See* ECF 83-1 at 4–5.

To illustrate plaintiff's concern about implicit bias in student evaluations, plaintiff points to Puthoff's criticism of plaintiff's "policy of not answering questions during exams," which was raised by students as a point of concern.  ECF 83-1 at 12.  The Department's 2018 renewal evaluation for plaintiff states that a "concerning aspect" of his teaching "is the interaction between him and his students during lecture, lab and during exams."  ECF 91-16 (Jennings Second Year Evaluation) at 2.  The Department noted that, "[b]ased upon multiple students' written comments and comments voiced to multiple faculty members during 2018, it seems Dr. Jennings can be dismissive and condescending when addressing students and their questions."  *Id.*  At his deposition, Dr. Puthoff stated: "One of the most influential [comments] was Dr. Jennings' unwillingness to answer questions during exams."  ECF 82-9 (Puthoff Dep.) at 39; *see id.* at 16 (Jennings Faculty Renewal Evaluation) at 4 (including a note that "Dr. Jennings will not answer ANY question during an exam" and stating that "[s]tudents should be able to get clarity during exam periods and not get a shrug from the instructor while pointing to a note on the whiteboard stating that no questions will be answered").

In plaintiff's rebuttal letter to Dean Campbell, challenging the nonrenewal recommendation, Jennings explained that his "policy not to answer questions during an exam was created to help ensure equality in test administration" because "students with disabilities take exams separate from the rest of the class" and it would be "unfair to the students who deserve reasonable accommodation and who also deserve equity in test taking" if he were to answer questions in class "for students who do not require testing accommodation."  ECF 55-30 (Jennings Rebuttal) at 11.

Further, Dr. Franklin Hughes, D.C. stated at his deposition that he also refrained from answering questions during exams, in part to ensure equal treatment between students with and without testing accommodations.  ECF 82-26 (Hughes Dep.) at 25–26.  And, in terms of the students' perspective that Jennings was condescending, Jennings noted in his rebuttal that, as a professor, he is "in a position of authority over the students, yet unlike other faculty in the Department and College, [he has] no physical stature over them" leading to the possibility that "a direct answer to a question could be misconstrued, which is an example of disability bias."  ECF 55-30 (Jennings Rebuttal) at 11.

As indicated, beyond this critique of reliance on student evaluations in general, Jennings also contends that the student evaluations were given more weight with respect to his renewal evaluation than is appropriate under FSU's renewal process, and more weight as compared to the renewal evaluation process for other, able-bodied professors.  In his responses to the Preliminary Questionnaire to the Maryland Commission on Civil Rights, a form used as an initial step for filing a complaint, Jennings stated: "In the renewal of other faculty members (caucasian able-bodied males, not in a protected class), I have observed that the Department has only nominal discussion of student teaching evaluation surveys/scores.  Yet in my case these scores were cited as the primary, if not only, formal justification for non-renewal, despite being higher than the published criteria in the Faculty Handbook."  ECF 83-52 (Preliminary Questionnaire Responses) at 5.

Jennings raised the same concern in his rebuttal letter to Dean Campbell, stating: "From my observations of how the Department reviews and renews other faculty, I very much feel that I have been subjected to significantly more scrutiny and higher standards than other members of the Department, both tenured and tenure track."  ECF 55-30 (Jennings Rebuttal) at 17.  In sum, Jennings explained, ECF 82-12 (Jennings Dep.) at 40:

> [M]y department . . . would talk about how biased . . . student surveys and student feedback can be but then when they would . . . turn to criticize me or in their evaluation of me, it seemed that they relied, you know, pretty much exclusively on whatever any student had said to them about me without ever doing any investigation or anything.

To support plaintiff's assertion of differential treatment, he points to an evaluation of another professor in 2017 in which Puthoff wrote: "The Department of Biology realizes that student evaluations continue to be an integral part of determining the efficacy of a faculty member's teaching performance, but I, as Chair, am apprehensive about relying too heavily on this approach given that the reliability of this assessment [of using student evaluations] has been questioned in various publications including studies that have shown that these types of evaluation statistics do not reflect a person's ability to teach and in fact have been shown to correlate with other factors such as gender, race, and attractiveness." ECF 83-1 at 4. Plaintiff contends that this stands in contrast to the renewal evaluation process used for him, in which "student evaluations were focused upon very heavily." ECF 83-1 at 39.

At his deposition, Puthoff testified that relying on students to evaluate teaching performance is "like having your car evaluated by a plumber." ECF 82-9 (Puthoff Dep.) at 52. Murtagh, another FSU faculty member, testified that the existence of bias in student evaluations is a "widely-held belief" among faculty. ECF 82-10 (Murtagh Dep.) at 11–12. In addition, notes from the Department's meeting on January 22, 2019, regarding the renewal evaluation for Hughes, another FSU professor, state: "We ignored numeric scores from the student evaluations because research has shown they are biased against women and minority groups. This has evolved from department discussions over the past few years and we are instructed not to focus on scores in our annual evaluations to the Department Evaluation Committee (DEC)." ECF 82-54 (Notes From Biology Department Meeting on Frank Hughes Renewal) at 2. As Jennings explained, ECF 82-12 (Jennings Dep.) at 40: "[I]t is hard to conclude what the department really believes about student

feedback . . . because I heard a lot about how biased student feedback was around the department but then . . . I was often told that I just . . , was not doing a good job because of student feedback."

Notably, "the Rehabilitation Act does not serve to immunize a disabled employee from discipline in the workplace based on a violation of a *valid* work rule *applied to all employees*." *Luther v. Gutierrez*, 618 F. Supp. 2d 483, 493 (E.D. Va. 2009) (emphasis added).  But, based on these disputes, it is not clear whether substantial reliance on student evaluations for renewal decisions is either valid or applied consistently to all faculty.  Because defendants argue that the legitimate, non-discriminatory reason for refusing to renew plaintiff's appointment at FSU was his teaching performance, as reviewed by students, and there is evidence demonstrating that these evaluations were not relied upon, or relied upon to the same extent, for able-bodied professors, a genuine dispute of material fact exists as to whether the heavy focus on student evaluations was pretextual.  Drawing all inferences in plaintiff's favor, a reasonable jury could conclude that this is circumstantial evidence of discrimination based on disability.

Moreover, defendants state that "the Department also based its decision not to renew Dr. Jennings's appointment based on the lack of guidance in the materials Dr. Jennings submitted for review."  ECF 55-1 at 21.  However, plaintiff argues that this is contradicted by the testimony of several faculty members, who expressed "no real concerns" about the class syllabus and course materials.  ECF 83-1 at 12.

Ultimately, a resolution of these factual disputes requires credibility determinations.  And, that is not the role of the court.  *See Black & Decker Corp.*, 436 F.3d at 442.

Additionally, plaintiff alleges that similarly situated, able-bodied employees were treated more favorably than he was during the renewal evaluation process.  ECF 83-1 at 19–25.  But, defendants argue that these professors are not similarly situated because "the Department did not

identify serious concerns with their teaching performance at the time of their second-year renewal evaluations," as they claim was the case with Jennings.  ECF 55-1 at 24.  However, plaintiff details the alleged comparators' experiences in the renewal process, student evaluation scores, and comments in the renewal evaluation forms as the basis for his comparison.  ECF 83-1 at 19–25.

"A plaintiff may support an inference that the employer's stated reasons were pretextual, and the real reasons were prohibited discrimination or retaliation, by citing the employer's better treatment of similarly situated employees outside the protected group."  *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (citing *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 495 & n.3 (D.C. Cir. 2008)).  A similarly situated employee is one who is "similar in all relevant respects" to plaintiff.  *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010); *see Irani v. Palmetto Health*, 767 F. App'x 399, 420 (4th Cir. 2019) (per curiam); *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745 (4th Cir. 2017), *as amended* (Aug. 11, 2017); *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008) ("The similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful.").  "Such a showing would include evidence that the employees 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Id.* (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577 (6th Cir. 1992)).

Put another way, "'the inquiry simply asks whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination.'"  *Swaso*, 698 F. App'x at 748 (quoting *Eaton v. Ind. Dep't of Corr.*, 657 F.3d 551, 556 (7th Cir. 2011)).  Whether a plaintiff is similarly situated to employees

43

who were treated differently is "a factual issue for a jury." *Willis v. Town of Marshall, N.C.*, 275 F. App'x 227, 233 (4th Cir. 2008); *see also Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) ("Generally, whether parties are similarly situated is a fact-intensive inquiry."); *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004) ("As a general rule, whether individuals are similarly situated is a factual question for the jury.").

It is clear that there are several genuine disputes of material fact precluding summary judgment under the Rehabilitation Act.  And, because the claim under the Rehabilitation Act survives summary judgment, so too does the claim brought pursuant to MFEPA.

Accordingly, I shall deny the Summary Judgment Motion as to the disability discrimination claims in Counts I (MFEPA) and II (Rehabilitation Act).

### 2.  Retaliation Claims (Counts III and IV)

Counts III and IV of the Complaint charge defendants with retaliation in violation of MFEPA (Count III), as well as Section 504 of the Rehabilitation Act (Count IV).  *See* ECF 2 at ¶¶ 65–82.

"Adopting provisions of the ADA, the [Rehabilitation Act] provides that no person shall retaliate against an individual because that individual engages in activity challenging an employer's alleged discrimination." *Hooven-Lewis v. Caldera*, 249 F.3d 259, 272 (4th Cir. 2001) (alteration added); *See* 42 U.S.C. § 12203(a).  And, MFEPA contains "functionally identical prohibitions." *Buckmaster v. Nat'l R.R. Passenger Corp.*, No. RDB-19-3203, 2022 WL 1081947, at *6 (D. Md. Apr. 11, 2022).   Thus, retaliation claims under MFEPA and Section 504 of the Rehabilitation Act are subject to the same standards. *Id.*  These standards are also used to analyze retaliation claims under Title VII. *See id.* at 12.

To succeed on a claim of retaliation, a plaintiff must show that: (1) he engaged in a protected activity; (2) the employer acted adversely against him; and (3) there was a causal connection between the protected activity and the adverse action.  *Barreto v. SGT, Inc.*, 826 F. App'x 267, 271 (4th Cir. 2020) (citation omitted); *Hooven-Lewis*, 249 F.3d at 272 (citing *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998)).

As to the first element, the Fourth Circuit has explained that, "in the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation."  *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005); *see Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir. 2018).  "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998).

"Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities."  *Id.*  In the related context of Title VII, "[t]o fall under the protection of the opposition clause . . . behavior need not rise to the level of formal charges of discrimination." *Armstrong v. Index J. Co.*, 647 F.2d 441, 448 (4th Cir. 1981) (citation omitted).  However, "for an employee's activity to constitute protected 'opposition,' [he] must show (1) that [he] reasonably believed that the employment action [he] opposed constituted a Title VII violation, and (2) that [his] conduct in opposition was reasonable."  *Netter*, 908 F.3d at 937–38 (alterations added).

The second element is that of an "adverse action."  In *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 372 (4th Cir. 2018), the Fourth Circuit explained that an "adverse employment action" is not the standard in a retaliation case.  In other words, the adverse action "need not be

employment or workplace-related in order to sustain a retaliation claim." *Id.*; *see also Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.").  That said, "retaliatory actions do have to be 'materially adverse'— such that they 'might have dissuaded a reasonable worker' from engaging in protected activity." *Strothers*, 895 F.3d at 327 (quoting *Burlington Northern*, 548 U.S. at 68).  The "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern*, 548 U.S. at 67.  Although the anti-retaliation provision "does not protect against 'petty slights, minor annoyances, and simple lack of good manners,'" *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 738 (D. Md. 2009) (quoting *Burlington Northern*, 548 U.S. at 68), "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion" constitute adverse actions.  *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999).

To establish causation, the third element, the plaintiff bears the burden of establishing that the alleged retaliation "would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013); *see Irani v. Palmetto Health*, 767 F. App'x 399, 421 (4th Cir. 2019) (per curiam).  At trial, the plaintiff may proceed either by direct evidence "or by proving that any non-retaliatory justification for the [adverse action] was pretextual." *Netter*, 908 F.3d at 938; *Foster v. Univ. of Md.–E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015).  This requirement is also described as "but-for" causation.

The Fourth Circuit has made clear that to establish a causal relationship between the protected activity and the adverse action, "a plaintiff must show that the decisionmaker was aware of the protected activity at the time the alleged retaliation occurred." *Roberts v. Glenn Indus. Grp.,*

*Inc.*, 998 F.3d 111, 124 (4th Cir. 2021); *see Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998). As a result, if the "decisionmaker is unaware of any prior complaints, a plaintiff 'cannot establish the necessary causal connection.'" *Roberts*, 998 F.3d at 124. And, constructive knowledge is not sufficient. *Id.* at 125. Rather, actual knowledge is required. *Id.*

"A plaintiff may attempt to demonstrate that a protected activity caused an adverse action 'through two routes.'" *Id.* at 123 (quoting *Johnson v. United Parcel Service, Inc.*, 839 F. App'x 781, 783–84 (4th Cir. 2021)); *see Laurent-Workman v. Wormuth*, 54 F.4th 201, 218–19 (4th Cir. 2022); *Smith v. CSRA*, 12 F.4th 396, 417 (4th Cir. 2021). "A plaintiff may establish the existence of facts that 'suggest[ ] that the adverse action occurred because of the protected activity.'" *Roberts*, 998 F.3d at 123 (quoting *Johnson*, 839 F. App'x at 783–84); *see Wormuth*, 54 F.4th at 218. Or, a plaintiff may demonstrate that "the adverse act bears sufficient temporal proximity to the protected activity[.]" *Wormuth*, 54 F.4th at 218; *CSRA, Inc.*, 12 F.4th at 417; *Johnson*, 839 F. App'x at 784 (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)). Notably, "[t]he existence of relevant facts alone, or together with temporal proximity, may be used to establish a causal connection between the protected activity and the adverse action." *Roberts*, 998 F.3d at 123.

To be sure, "temporal proximity suffices to show a causal relationship." *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 645 (4th Cir. 2021). In *Strothers*, 895 F.3d at 335–36, the Court said: "An employee may establish prima facie causation simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *See also Constantine*, 411 F.3d at 501 ("In order to establish this causal

connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of her engaging in protected activity.") (citing *Dowe*, 145 F.3d at 657).

For the temporal route, there naturally must exist "some degree of temporal proximity to suggest a causal connection." *Constantine*, 411 F.3d at 501. But, "there is no 'bright-line rule' for when temporal proximity helps or hurts a cause of action for retaliation." *Wormuth*, 54 F.4th at 219 (quoting *Roberts*, 998 F.3d at 126–27). However, temporal proximity may establish causation only if it is "very close." *Breedan*, 532 U.S. at 273. Therefore, a "'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action'" often "'negates any inference that a causal connection exists between the two.'" *Id.* (citation omitted).

Jennings alleges in the Complaint that, in response to his repeated requests for accommodations and his "speak[ing] out" about the alleged discrimination in his appeal of the nonrenewal decision (ECF 2, ¶ 69), defendants "fail[ed] to engage in good faith in an interactive process"; "fail[ed] to provide effective accommodations"; "fail[ed] to subject him to the same terms, conditions, and criteria of employment as other, able-bodied employees"; and, "most significantly," did not renew and terminated his employment. *Id.* ¶ 70. According to Jennings, these actions were "all undertaken in retaliation for . . . the aforementioned protected activities." *Id.*

Defendants concede that Jennings engaged in protected activity and suffered an adverse action. ECF 55-1 at 24. But, they contend that he "cannot establish the third element of his relation claim[s] because there is no evidence of a 'causal connection' between any protected activity and the adverse action." *Id.* at 26 (alteration added). In particular, defendants argue that Puthoff was the only Department member aware of the accommodation requests, and that the Department had

already recommended nonrenewal before plaintiff's appeal to Dean Campbell and Provost Throop, in which he alleged discrimination. *Id.* at 26–28. And, defendants argue that, "[i]f anything, the evidence suggests that Dr. Campbell and Dr. Throop carefully considered Dr. Jennings's appeals . . . prior to affirming the nonrenewal," as demonstrated when "Dr. Throop considered reversing the Department's recommendation in order to avoid a potential lawsuit and met with Dr. Puthoff and Dr. Mutagh to discuss the decision before she decided to affirm the recommendation." *Id.* at 28.

Jennings focuses on the evidence regarding Puthoff's meeting with Throop, reviewed earlier, to support his retaliation claims. *See* ECF 83-1 at 43. He contends that at the time Throop informed Puthoff of Jennings's discrimination claim, she considered reversing the Department's decision. ECF 83-1 at 43. But, Puthoff met with Throop "the very next day" to convince Throop to uphold the Department's nonrenewal recommendation. *Id.* (emphasis removed). Jennings argues that the occurrence of the meeting, and Throop's "complete reversal from renewal to nonrenewal" just after this meeting, demonstrates retaliation based on his allegations of discrimination. *Id.* And, plaintiff asserts that Throop had already reviewed all of the materials and came to a decision prior to meeting with Puthoff, but changed this decision after the meeting, with no additional documentary evidence. *Id.* at 44. Jennings also notes that Murtagh testified that it was the first meeting of this kind that he attended since beginning at FSU in 2007. *Id.* at 31 n.33.

Moreover, Jennings argues that in January 2020, another professor, Dr. Katherine Sheehan, was recommended for nonrenewal by the Department but did not allege discrimination in her appeal to reverse the decision. *Id.* at 24. The Dean, who had since replaced Campbell, and Throop

reversed the nonrenewal and recommended a provisional renewal instead.  *Id.*  And, this time, Puthoff did not conduct a meeting, as he had for Jennings.  *Id.*

In fact, Campbell testified that FSU's policies for the renewal process do not include a rebuttal for the department chair, after the faculty member submits a rebuttal, stating that she "suspect[s] they would not want the faculty member railroaded by the [department chair] weighing in twice."  ECF 82-29 (Campbell Dep.) at 6.  Yet, defendants stated in their Reply that, "as explained by Dr. Campbell, it simply makes sense for department chairs such as Dr. Puthoff to remain engaged in the process after a department makes a nonrenewal recommendation because the chair will know more about the candidate than anyone else."  ECF 91 at 18 (citing ECF 91-23 (Campbell Dep.) at 2.  This discrepancy in explaining the proper procedures for renewal evaluations constitutes a genuine dispute of material fact, precluding entry of summary judgment.

Accordingly, I shall deny the Motion for Summary Judgment as to the retaliation claims raised in Counts III (MFEPA) and IV (Rehabilitation Act).

### 3.  Failure to Accommodate Claims (Counts V and VI)

Plaintiff's failure to accommodate claims arise under both MFEPA (Count V) and Section 504 of the Rehabilitation Act (Count VI).  *See* ECF 2, ¶¶ 83–98.  Defendants argue that they are entitled to summary judgment on these claims because the claims are untimely under the relevant statutes of limitations.  ECF 55-1 at 28.  In addition, defendants argue that they are entitled to summary judgment as to Count V because plaintiff failed to exhaust his administrative remedies.

#### a.  Statute of Limitations

Defendants assert that MFEPA imposes a two-year statute of limitations on failure to accommodate claims, and that the Rehabilitation Act "'borrow[s]'" this, thereby also imposing a two-year statute of limitations on failure to accommodate claims.  ECF 55-1 at 28 (quoting *A Soc'y*

*Without A Name v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011)) (alteration added).  In addition, defendants contend that Jennings "requested certain accommodations for his disability when he began employment at the University in August of 2017," but waited until October 30, 2020, to raise a claim for failure to accommodate, which was more than three years after his request and more than two years after he learned of the nonrenewal decision.  *Id.* at 29.

Jennings concedes that his "very first requests for reasonable accommodations" occurred more than two years before he filed suit.  ECF 83-1 at 33.  But, he contends that he reasserted his request for accommodations in the "November 2018 rebuttal submissions to Dean Campbell and Provost Throop," which falls within the limitations period.  *Id.* at 33–34.

Defendants are correct that MFEPA's two-year statute of limitations applies with the same force to the Rehabilitation Act.   In  *Ott v. Maryland Department of Public Safety & Correctional Services*, 909 F.3d 655, 659 (4th Cir. 2018), the Court said: "Amendments to the MFEPA . . . make it an appropriate analogous statute to provide the statute of limitations for Rehabilitation Act claims."  However, defendants appear to argue that the cause of action accrues at the time an employee makes a request for accommodation.  This is not the case.  Rather, "Rehabilitation Act claims accrue when a plaintiff knows or has reason to know of the injury upon which the action is based."  *Williams v. Va. Polytechnic Inst. & State Univ.*, 451 F. Supp. 3d 467, 475 (E.D. Va. 2020) (citing *A Soc'y Without A Name*, 655 F.3d at 348).

The elements required to assert a prima facie case for a claim of failure to accommodate are the same under MFEPA and the Rehabilitation Act.  *See Johnson v. Md. Transit Admin.*, No. CV CCB-19-2523, 2021 WL 809768, at *3 (D. Md. Mar. 2, 2021).  The prima facie case for a failure to accommodate claim is also the same under the ADA.  *See Haneke v. Mid-Atlantic Capital Mgmt.*, 131 F. App'x. 399, 400 (4th Cir. 2005).  Pursuant to these statutes, a plaintiff asserting a

failure to accommodate claim must show: "(1) [he] was a qualified person with a disability; (2) the employer had notice of [his] disability; (3) the plaintiff could perform the essential functions of [his] position with a reasonable accommodation; and (4) the employer nonetheless refused to make the accommodation." *Johnson*, 2021 WL 809768, at *3 (first citing *Hannah P.*, 916 F.3d at 337 (Rehabilitation Act), then citing *Adkins v. Peninsula Reg'l Med. Ctr.*, 224 Md. App. 115, 139, 119 A.3d 146, 160 (2015) (MFEPA), *aff'd*, 448 Md. 197, 137 A.3d 211 (2016)) (alterations added).

Notably, the fourth element of the prima facie case requires that the employer actually refuse to make the reasonable accommodation. "Implicit in the fourth element is the . . . requirement that the employer and employee engage in an interactive process to identify a reasonable accommodation." *Haneke*, 131 F. App'x at 400 (discussing the ADA, citing 29 C.F.R. § 1630.2(o)(3)). "Both the employee and employer bear a burden of engaging in the interactive process in good faith." *Williams*, 451 F. Supp. 3d at 477 (citing *Haneke*, 131 F. App'x at 400). Although "an employee cannot base a reasonable accommodation claim solely on the allegation that the employer failed to engage in an interactive process," an employer may be liable for its "failure to engage in the interactive process result[ing] in the failure to identify an appropriate accommodation for the disabled employee." *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 323 (4th Cir. 2011).

Of import here, it is not clear that defendants meaningfully responded to plaintiff's request for accommodations.  It is undisputed that, beginning in August of 2017, Jennings communicated to FSU personnel "his need for the accommodation of power door openers" for the bathroom doors in his lab.  ECF 83-1 at 7; ECF 55-1 at 29.  It is also undisputed that this request was not granted. ECF 83-1 at 8; ECF 55-1 at 29 ("[T]he University did not install automatic door-openers to Dr. Jennings's laboratory or to a public restroom in the building where he worked.").  Jennings wrote

in his November 2018 rebuttal to Dean Campbell that, "[i]n Winter 2017/2018, I met with designers or contractors and Mr. Duane Miller (FSU Physics/Engineering) to discuss the installation of this accommodation."  ECF 83-1 at 9.  But, there is no indication that any other action was taken as to plaintiff's request.  Indeed, Jennings contends, and defendants do not dispute, that "the request was never actually denied formally."  ECF 83-1 at 9.  Jennings testified that he believed the request "had been heard" and it "was in progress."  ECF 82-12 (Jennings Dep.) at 20.

Defendants maintain that Jennings "knew, or had reason to know, that the requested automatic door openers had not been installed that semester (fall of 2017) or even the following semester (spring of 2018)" and that he "certainly knew or had reason to know that the requested automatic door openers had not been installed when he returned to campus for the fall semester of 2018."  ECF 55-1 at 29.  "At the very least," defendants argue, Jennings "knew or had reason to know that the automatic door openers had not been installed at the time he learned of the Department's nonrenewal recommendation on October 19, 2018, which was 14 months after the request was first made."  *Id.* (emphasis removed).  But, plaintiff was not notified of the final decision as to his nonrenewal until December of 2018.  ECF 55-36 (President Nowaczyk Letter).

As noted, failure to accommodate claims under the Rehabilitation Act "accrue when a plaintiff knows or has reason to know of the injury upon which the action is based."  *Williams*, 451 F. Supp. 3d at 475.  The Fourth Circuit has found that an EEOC filing period requirement begins to run "from the time at which the employee is informed of the allegedly discriminatory employment decision, regardless of when the effects of that decision come to fruition."  *Price v. Litton Bus. Sys., Inc.*, 694 F.2d 963, 965 (4th Cir. 1982) (citing *Del. State Coll. v. Ricks*, 449 U.S. 250 (1980)).  In *Price*, 694 F.2d at 965, the Court concluded that the plaintiff's 180-day time period

to file his claim for employment discrimination began to run on the date he was informed he would be "relieved of his position."

In general, district courts in this circuit and in others have concluded that the statute of limitations does not begin to run until an employee is notified of the final decision on the request. *See, e.g. Cathey v. Wake Forest Univ. Baptist Med. Ctr.*, 90 F. Supp. 3d 493, 502–03 (M.D.N.C. 2015) ("[T]he limitations period for [plaintiff] did not commence until she was reasonably put on notice that [defendant] had made a final decision on her accommodation request."); *Faircloth v. Goodyear Tire & Rubber Co.*, No. 5:13–CV–336, 2013 WL 6410233, at *2 (E.D.N.C. Dec. 9, 2013) (finding that the limitations period did not commence until employee was reasonably on notice of denial of accommodation because employee reasonably relied on employer's promises to "continue to work his situation out"); *Nakis v. Potter,* No. 01 CIV. 10047, 2004 WL 2903718, at *15 (S.D.N.Y. Dec. 15, 2004) ("[A] claim based on a failure to accommodate does not accrue until that reasonable time has expired or the employer has irrevocably refused to make the accommodation.").

At this juncture, and guided by these principles, plaintiff's cause of action for failure to accommodate did not accrue until December 2018, when he was notified of the final decision not to renew his contract. Thus, plaintiff's failure to accommodate claims, filed in October of 2020, were timely.

Assuming, *arguengo*, that this suit was untimely as to plaintiff's failure to accommodate claim, based on the August 2017 request for accommodation, defendants still would not be entitled to judgment. This is because plaintiff reasserted his request for accommodations in his November 2018 rebuttal of the preliminary nonrenewal recommendation. *See* ECF 83-1 at 9–10. Jennings wrote to Dean Campbell: "After nearly a year, there are still no power door openers on these doors.

54

I certainly question the University's interest in providing reasonable accommodation." ECF 55-30 (Jennings Rebuttal) at 11.

A request for accommodation "need not [be] a formal request . . . nor must the employee use 'magic phrases.'" *Adkins*, 224 Md. App. at 140, 119 A.3d at 161 (quoting *Pollard v. Balt. Cnty. Bd. of Educ.*, 65 F. Supp. 3d 449, 456 (D. Md. 2014)). Rather, "the employee must provide the employer with 'adequate notice' of his disability and need for accommodation." *Adkins*, 224 Md. App. at 140, 119 A.3d at 161 (quoting *Pollard*, 65 F. Supp. 3d at 465). "The key consideration in determining whether an employee has satisfied the second element of his or her prima facie case is whether the employee 'provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation.'" *Peninsula Reg'l Med. Ctr.*, 448 Md. at 214, 137 A.3d at 221 (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999)). Indeed, "[t]he notice requirement . . . is 'not an onerous [burden].'" *Works v. Colvin*, 93 F. Supp. 3d 405, 416 (D. Md. 2015) (quoting *Schneider v. Giant of Md., LLC*, 389 F. App'x 263, 270 (4th Cir. 2010), *aff'd sub nom. Works v. Berryhill*, 686 F. App'x 192 (4th Cir. 2017)) (alteration in *Works*).

Jennings clearly informed defendants of his desire for the requested accommodation. He stated that he had already made a request, that the request had not come to fruition, and he still desired the accommodation. *See* ECF 83-1 at 9. In fact, Puthoff testified that, just after receiving the rebuttal letter, Dean Campbell "wanted more information about how the accommodation requests were coming." *See* ECF 82-9 (Puthoff Dep.) at 58–59. This testimony permits a reasonable inference that defendants knew that plaintiff had renewed his request. And, it speaks to their own understanding that the original request, made in August of 2017, was not denied or refused, but remained pending.

Thus, in the light most favorable to plaintiff, the November 2018 rebuttal letter constitutes a renewed request for accommodation, occurring less than two years prior to plaintiff filing his Complaint in October of 2020.  Accordingly, defendants are not entitled to summary judgment based on a limitations defense.[9]

### b.  Failure to Exhaust Administrative Remedies

Defendants assert that the MFEPA failure to accommodate claim (Count V) is precluded because plaintiff "failed to satisfy the statutory requirement that he first exhaust his administrative remedies."  ECF 55-1 at 30.   Specifically, defendants state that Dr. Jennings's EEOC Charge, which concerned claims of discrimination and retaliation, "included no allegation or suggestion that the University failed to provide reasonable accommodations for his disability," and his claim "that the University's failure to install automatic door openers constituted a failure to accommodate first appeared in this civil action."  *Id.* at 30–31.

Plaintiff concedes that "there is no express reference to 'failure to accommodate' in Dr. Jennings's *pro se* Charge of Discrimination," but states that "there was such a reference in his Pre-Charge Inquiry."  ECF 83-1 at 35.  According to Jennings, the reference made in his Pre-Charge Inquiry made it "quite likely" that the failure to accommodate issue "would have come up in the course of the EEOC's investigation" and "would have been explored" in a reasonable administrative investigation.  *Id.* at 36.

MFEPA incorporates the exhaustion procedures of Title VII of the Civil Rights Act of 1964, codified as amended at 42 U.S.C. §§ 2000e *et seq. Alexander*, 2011 WL 1231029, at *6 (referring to MFEPA as "the state law analogue of Title VII."); *see also* 42 U.S.C. § 2000e-5(f)(1)

---

[9] Jennings also asserts that, as to the MFEPA claim (Count V), the "continuing violation doctrine" applies to render his claims timely.  ECF 83-1 at 34.  But, because I have concluded that his requests for accommodations were timely, I need not address this argument.

(2006) (permitting civil suit by the "person claiming to be aggrieved" after filing of a charge with the EEOC and upon receipt of a right-to-sue letter).  Thus, MFEPA requires a plaintiff to exhaust administrative remedies prior to filing suit in court.  *See Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297, 306 (4th Cir. 2019) (Title VII); *Johnson v. United Parcel Serv., Inc.*, No. CIV.A. RDB-14-4003, 2015 WL 4040419, at *6 (D. Md. June 30, 2015) (concluding that MFEPA requires administrative exhaustion prior to filing suit).

A plaintiff exhausts his administrative remedies when he files a charge with the EEOC. *See Sydnor v. Fairfax Cnty., Va.*, 681 F.3d 591, 593 (4th Cir. 2012).  An EEOC charge puts the employer on notice of alleged violations, allowing it to "address the alleged discrimination prior to litigation." *Id.*  "The goals of providing notice and an opportunity for an agency response would be undermined, however, if a plaintiff could raise claims in litigation that did not appear in his EEOC charge." *Id.*

An aggrieved party who fails to comply with the applicable administrative procedures has failed to exhaust his administrative remedies and is generally barred from filing suit.  *See, e.g.*, *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 407 (4th Cir. 2013); *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005); *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002). Notably, the exhaustion requirement is not "simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Chacko v. Patuxent Institution*, 429 F.3d 505, 510 (4th Cir. 2005); *see also Miles*, 429 F.3d at 491 (The "exhaustion requirement ensures that the employer is put on notice of the alleged violations so that the matter can be resolved out of court if possible.").  Rather, together with the agency investigation and settlement process it initiates, the exhaustion requirement "'reflects a congressional intent to use administrative conciliation as the primary means of handling claims, thereby encouraging quicker, less formal, and less

expensive resolution of disputes.'"  *Balas*, 711 F.3d at 407 (quoting *Chris v. Tenet*, 221 F.3d 648, 653 (4th Cir. 2000)).  "Allowing [the EEOC] first crack at these cases respects Congress's intent." *Sydnor*, 681 F.3d at 593.

However, the Supreme Court has clarified that "Title VII's charge-filing requirement is not of jurisdictional cast."  *Fort Bend Cnty., Tex. v. Davis*, 139 S. Ct. 1843, 1850 (2019).  In *Davis*, the Supreme Court explained, *id.* at 1850–51 (alterations added):

> Federal courts exercise jurisdiction over Title VII actions pursuant to 28 U.S.C. § 1331's grant of general federal-question jurisdiction, and Title VII's own jurisdictional provision, 42 U.S.C. § 2000e–5(f)(3) (giving federal courts "jurisdiction [over] actions brought under this subchapter").  Separate provisions of Title VII, § 2000e–5(e)(1) and (f)(1), contain the Act's charge-filing requirement.  Those provisions "d[o] not speak to a court's authority," [*E.P.A. v. EME Homer City Generation, L.P.*, 572 U.S. 489, 512 (2014)] or "refer in any way to the jurisdiction of the district courts," *Arbaugh* [*v. Y&H Corp.*, 546 U.S. 500, 515 (2006)) (quoting *Zipes* [*v. Trans World Airlines, Inc.*], 455 U.S. [385 (1982)].
>
> Instead, Title VII's charge-filing provisions "speak to . . . a party's procedural obligations."  *EME Homer*, 572 U.S. at 512, 134 S.Ct. 1584.  They require complainants to submit information to the EEOC and to wait a specified period before commencing a civil action.  Like kindred provisions directing parties to raise objections in agency rulemaking, *id.*, at 511–512, 134 S.Ct. 1584; follow procedures governing copyright registration, *Reed Elsevier*, 559 U.S. at 157, 130 S.Ct. 1237; or attempt settlement, *Union Pacific*, 558 U.S. at 82, 130 S.Ct. 584, Title VII's charge-filing requirement is a processing rule, albeit a mandatory one, not a jurisdictional prescription delineating the adjudicatory authority of courts. . . .
>
> In sum, a rule may be mandatory without being jurisdictional, and Title VII's charge-filing requirement fits that bill.

Of import here, "'EEOC charges must be construed with utmost liberality since they are made by those unschooled in the technicalities of formal pleading.'"  *Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll.*, 848 F.2d 457, 460 (4th Cir. 1988) (quoting *Kaplan v. Int'l Alliance of Theatrical & Stage Employees*, 525 F.2d 1354, 1359 (9th Cir. 1975)).  Indeed, in general, "'laypersons, rather than lawyers,'" are the ones who "initiate" the remedial process.  *Fed. Exp. Corp. v. Holowecki*, 552 U.S. 389, 402 (2008) (quoting *EEOC v. Com. Office Prods. Co.*, 486 U.S.

107, 124 (1988)).   Moreover, the exhaustion requirement was not intended to create "insurmountable barriers" based on "overly technical concerns."  *Sydnor*, 681 F.3d at 594.

Therefore, where "a plaintiff's claims in [his] judicial complaint are reasonably related to [his] EEOC charge and can be expected to follow from a reasonable administrative investigation, the plaintiff may advance such claims in [his] subsequent civil suit."  *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000) (alterations added) (citing *Chisholm v. United States Postal Serv.*, 665 F.2d 482, 491 (4th Cir. 1981)).  But, "[o]nly those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII [or MFEPA] lawsuit."  *Walton v. Harker*, 33 F.4th 165, 172 (4th Cir. 2022) (quoting *Stewart v. Iancu*, 912 F.3d 693, 705 (4th Cir. 2019)) (internal quotations and citations omitted).

Plaintiff's Charge of Discrimination marks the boxes next to discrimination based on "disability" and "retaliation."  *See* ECF 55-1 at 31; ECF 55-37 (EEOC Charge).  In describing the nature of his charges, Jennings made three allegations, ECF 55-37 (alterations added):

> I began my employment with the above-named Respondent on August 16, 2017.  My position is Assistant Professor.  On December 13, 2018 and without being allowed an internal appeal hearing at the Faculty Appeals Committee, I received a letter from Ronald Nowaczyk University President that my contract will not be renewed and my last day of employment will be May 23, 2019.
>
> Respondents [sic] reason for not renewing my contract is low teaching scores, though my scores and job performance are above the criteria published as official University policy[.]
>
> I believe I have been discriminated against based on my disability in violation of the Americans with Disabilities Act of 1990, as amended by the Americans with Disabilities Act Amendments Act of 2008, with respect to discharge.

Defendants correctly state (ECF 55-1 at 31) that this EEOC Charge did not include any "allegation or suggestion that the University failed to provide reasonable accommodations for his

disability."  However, Jennings clearly referenced the ADA.  And, Jennings relies on the fact that he described the failure to accommodate claim in his Pre-Charge Inquiry.  ECF 83-1 at 35; *see* ECF 82-50 (Pre-Charge Inquiry).  The Pre-Charge Inquiry form states that its purpose is to allow the EEOC to "determine if [the filer's] concerns are covered by the employment discrimination laws [it] enforce[s]."  ECF 82-50 (Pre-Charge Inquiry) at 1.

On the form, Jennings indicated that he experienced retaliation by checking two boxes: "I complained to my employer about job discrimination" and "I requested an accommodation for my disability or religion."  ECF 82-50 (Pre-Charge Inquiry) at 3.  He contends that this "makes it quite likely that" the failure to accommodate issue would have arisen in the course of a reasonable investigation.  ECF 83-1 at 35.

But, as defendants argue in their Reply (ECF 91 at 6), the Pre-Charge Inquiry explicitly warns filers that it "is not a charge of discrimination."  *See* ECF 82-50 (Pre-Charge Inquiry) at 1 (emphasis removed).  And, defendants state that they were not provided with the Pre-Charge Inquiry and therefore "were not on notice of any allegations set forth in it."  ECF 91 at 6.  Moreover, defendants contend that, to the extent that the Pre-Charge Inquiry could be "deemed a viable substitute for the Charge of Discrimination," plaintiff did not provide any details about the failure to accommodate, and only again addressed the nonrenewal decision in the space provided to explain his claims.  *Id.* at 6–7; *see* ECF 82-50 (Pre-Charge Inquiry).

The Fourth Circuit has found that where a complaint alleged a violation on a basis that was not alleged in an EEOC Charge, and where the complaint alleged a theory of liability that was not alleged in an EEOC Charge, the plaintiffs failed to exhaust administrative remedies.  *See Bryant*, 288 F.3d at 132–33.  On the other hand, where allegations in a complaint match the discriminatory bases and theories of liability alleged in an EEOC Charge, the Fourth Circuit has found that

plaintiffs successfully exhausted claims for related conduct or requests that were not included in the EEOC Charge.

For example, in *Smith*, 202 F.3d at 248, the Court found exhaustion "where both the EEOC charge and the complaint included claims of retaliation by the same actor, but involved different retaliatory conduct." *Sydnor*, 681 F.3d at 594 (explaining *Smith*). And, in *Sydnor*, 681 F.3d at 594–95, the Court concluded that the plaintiff had exhausted her claim for a particular kind of accommodation under the ADA, even though her EEOC Charge did not mention that she had requested that particular accommodation. The Court reasoned that the plaintiff's EEOC Charge "claimed what her suit now claims—that she had 'been discriminated against based on [her] disability' by being 'denied a reasonable accommodation'"; "that the allegations in both "involved the same place of work and the same actor"; and that both "focused on the same type of discrimination," i.e., "that she 'was denied a reasonable accommodation.'" *Id.* (quoting the record) (alteration in *Sydnor*). The *Sydnor* Court concluded, *id.* at 595: "When taken together, the similarities between Sydnor's administrative and judicial narratives make clear that the [defendant] was afforded ample notice of the allegations against it."

Plaintiff's EEOC Charge does not contain a reference to a claim of failure to accommodate. Nor does he allege that he ever requested any accommodation. *See* ECF 55-37 (EEOC Charge). And, this claim may involve different actors and different time frames than those referenced in plaintiff's EEOC Charge, because plaintiff's initial request for accommodations occurred in 2017, but the nonrenewal decision occurred in 2018. Thus, I am of the view that plaintiff did not exhaust his administrative remedies for the purposes of his MFEPA failure to accommodate claim.

This conclusion is buttressed by similar holdings by fellow judges in this District, and by similar holdings of other circuit courts of appeal. *See, e.g.*, *Bennett v. Kaiser Permanente*, 931 F.

Supp. 2d 697, 704 (D. Md. 2013) (holding failure to accommodate charge was not reasonably related to EEOC charges where EEOC Charge stated: "I believe I have been discriminated against . . . with regard to discipline and discharge based on my . . . disability"); *Mayers v. Wash. Adventist Hosp.*, 131 F. Supp. 2d 743, 747 (D. Md. 2001) ("The charge is completely devoid of any reference to her alleged request for accommodation in May 1999.  Under these circumstances, the Court cannot find that the EEOC charge encompassed a claim for failure to make reasonable accommodations."), *aff'd*, 22 F. App'x 158 (4th Cir. 2001); *see also Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1187 (10th Cir. 2007) ("[T]he text of the charge does not contain facts that would prompt an investigation of Mr. Jones's claim that UPS failed to accommodate him.  Indeed, facts related to the alleged act of discrimination—UPS's failure to consider accommodating his perceived disability—are absent from the charge.  Because an investigation into whether UPS failed to accommodate Mr. Jones cannot 'reasonably be expected to follow the charge,' he has failed to exhaust his administrative remedies with respect to this claim.") (internal citations omitted); *Jones v. Sumser Ret. Vill.*, 209 F.3d 851, 853 (6th Cir. 2000) ("Jones's February 28, 1994, charge did not explicitly allege that Sumser failed to accommodate her disability.  Furthermore, such a claim does not reasonably grow out of the facts and claims she asserted.  The written charge specifically alleged only a termination claim.  Nothing in the charge pointed to any claim other than an improper refusal to keep Jones's job open while she recovered . . . . A termination claim differs in kind and date from an accommodation claim.").

Accordingly, Jennings has failed to exhaust the failure to accommodate claim set forth in Count V.  Therefore, I shall grant defendants' Summary Judgment Motion as to Count V.

### 4.  Conclusion

In sum, this case is replete with genuine issues of material fact precluding the entry of summary judgment as to plaintiff's two discrimination claims (Counts I and II) and his two retaliation claims (Counts III and IV).  Although plaintiff's failure to accommodate claims (Counts V and VI) are timely pursuant to the applicable two-year statute of limitations, defendants are entitled to summary judgment as to Count V, brought under MFEPA, because plaintiff failed to exhaust his administrative remedies.

Accordingly, I shall grant in part and deny in part defendants' Summary Judgment Motion (ECF 55).

### C.  Plaintiff's Motion for Sanctions based on Spoliation of Evidence

Plaintiff contends that defendants "engaged in acts of spoliation which clearly warrant the imposition of sanctions against them by the Court."  ECF 62.  Specifically, Jennings argues that defendants, "by their own admission, had destroyed" text messages and all other data from the FSU-issued cell phones of Dean Campbell and Provost Throop, which he argues contained "pertinent, discoverable documents."  ECF 62-1 at 3.

It is undisputed that defendants erased Campbell's phone on March 1, 2019, and Throop's phone on June 2, 2020.  *Id.* at 1.  Defendants assert that "per University policy, the University's Office of Information Technology erased their cell phones upon recovery," which occurred when each left their respective positions with FSU.[10]  ECF 85 at 3.  They argue that plaintiff's Motion for Sanctions "rests entirely upon the patently false assumption that text messages concerning Dr. Jennings existed in the first place."  *Id.* at 1.  Jennings argues that "the Court . . . should presume

_____

[10] Defendants note: "While Dr. Throop remained at the University as a lecturer for another year, she returned her University-issued cell phone when her tenure as Provost ended."  ECF 85 at 3 n.2.

that the lost information . . . was unfavorable to Defendants' interests in this case and would have benefited Plaintiff in the prosecution of his claims." *Id.* at 17.

Spoliation occurs when a party destroys or materially alters evidence or fails to preserve property that could be used as evidence in a pending case or a case that is reasonably foreseeable. *See Boone v. Everett*, 751 F. App'x 400, 401 (4th Cir. 2019) (per curiam); *see also Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001).  To establish that spoliation occurred, the moving party must show that: "(1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a culpable state of mind; and (3) the evidence that was destroyed or altered was relevant to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it." *Goodman*, 632 F. Supp. 2d at 509.

### 1.  Duty to Preserve

The first issue is whether defendants had an obligation to preserve the cell phone data at the time it was erased.  "A party seeking sanctions based on the spoliation of evidence must establish, inter alia, that the alleged spoliator had a duty to preserve material evidence." *Turner v. United States*, 736 F.3d 274, 282 (4th Cir. 2013).  The duty to preserve evidence arises "not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Silvestri*, 271 F.3d at 591.  "In order to fulfill the duty to preserve relevant evidence, '[o]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents.'" *Sampson v. City of*

*Cambridge, Md.*, 251 F.R.D. 172, 179 (D. Md. 2008) (quoting *Thompson v. U.S. Dep't of Hous. & Urban Dev.*, 219 F.R.D. 93, 100 (D. Md. 2003)) (alteration in *Sampson*).

However, "[t]he mere existence of a dispute does not necessarily mean that parties should reasonably anticipate litigation." *Goodman*, 632 F. Supp. 2d at 510.  Rather, this duty begins "somewhere between knowledge of the dispute and direct, specific threats of litigation." *Huggins v. Prince George's Cnty.*, 750 F. Supp. 2d 549, 560 (D. Md. 2010).  District courts within the Fourth Circuit have concluded that "'the receipt of a demand letter, a request for evidence preservation, a threat of litigation, or a decision to pursue a claim will all trigger the duty to preserve evidence.'" *Steves & Sons, Inc.*, 327 F.R.D. at 106 (quoting *In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 299 F.R.D. 502, 512 (S.D.W. Va. 2014)).  Notice that a potential plaintiff filed an EEOC Charge also suffices to trigger the duty.  *See Membreno v. Atlanta Rest. Partners, LLC*, 338 F.R.D. 66, 72 (D. Md. 2021).

To be sure, this is not an exhaustive list of events triggering the duty to preserve.  Indeed, "the absence of these things 'does not vitiate the independent obligation of an adverse party to preserve . . . information if th[at] party knows or should know of impending litigation." *Steves & Sons, Inc.*, 327 F.R.D. at 106 (quoting *Victor Stanley, Inc.*, 269 F.R.D. at 522) (alteration in *Steves & Sons, Inc.*).  Where these actions are absent, the events imputing reasonable anticipation of litigation are "highly case specific and fact dependent." *In re Ethicon*, 299 F.R.D. at 512.

Defendants' obligation to preserve evidence, in general, indisputably arose on March 19, 2019, when defendants first received notice of plaintiff's EEOC Charge.  ECF 85 at 3 ("The EEOC issued notice of the charge to the University on March 19, 2019."); *see Membreno*, 338 F.R.D. at 72 ("The Court finds that Defendants should have reasonably anticipated litigation beginning on or about April 26, 2017, when they received notice of Ms. Membreno's [EEOC] Charge, and that

they had a duty to preserve potentially relevant evidence beginning on that date.") (alteration added); *U.S. Equal Emp. Opportunity Comm'n v. MVM, Inc.*, TDC-17-2881, 2020 WL 6482193, at *2 (D. Md. Nov. 2, 2020) (finding "the date when the EEOC sent its initial notice to MVM of a pending Charge of Discrimination" to be an appropriate trigger date for the duty to preserve); *Eller v. Prince George's Cnty. Pub. Sch.*, TDC-18-3649, 2020 WL 7336730, at *4 (D. Md. Dec. 14, 2020) ("Defendants' obligation to preserve the potentially spoliated evidence arose . . . when Defendants first received notice of Plaintiff's EEOC Charge."). Therefore, by the time that Dr. Throop's cell phone was erased on June 2, 2020, defendants had an obligation, in general, to preserve evidence. Yet, defendants did not implement a litigation hold until "early 2021," upon learning of this civil action, which was nearly two years after they were informed of plaintiff's EEOC Charge. ECF 85 at 10 n.8.

Jennings argues that the duty was triggered even earlier: he contends that defendants should have reasonably anticipated litigation as of November 2018, when he submitted his rebuttal letter opposing the nonrenewal recommendation. ECF 62-1 at 6. I agree.

Plaintiff's written appeal of the nonrenewal decision "expressly raised the subject of discrimination." *Id.* Although defendants attempt to characterize the appeal as merely "allud[ing] to potential disability bias," without making it the "primary focus" (ECF 85 at 2 n.1), defendants conceded in their Response to Request for Admissions "that Plaintiff 'expressed his opposition' to what he characterized as discriminatory mistreatment in his appeal." ECF 62-1 at 8. And, in their Summary Judgment Motion, defendants state: "In his appeal to the Provost, Dr. Jennings . . . alleged that the Department discriminated against him." ECF 55-1 at 17. Defendants' clear understanding of the discrimination allegation is further supported by Provost Throop's reaction to the written appeal. Defendants admitted that "Dr. Puthoff recalls Dr. Throop, based on an

inaccurate assumption that disability may have been a factor in the nonrenewal of Plaintiff's contract, expressed concern that the decision might not be defensible in court." ECF 62-1 at 8. Therefore, it is clear that defendants understood plaintiff's written appeal as alleging discriminatory treatment. *See Eller*, 2020 WL 7336730, at *4 ("Plaintiff's February 2015 incident report about the harassment she experienced by a staff member should also have alerted Defendants to the need to preserve potentially relevant evidence for use in future litigation"); *but see Goodman*, 632 F. Supp. 2d at 511 ("It may be that a letter that merely identifies a dispute but expresses an invitation to discuss it or otherwise negotiate does not trigger the duty to preserve evidence.").

Furthermore, Throop's concern that "the decision might not be defensible in court" (ECF 62-1 at 8) implies that, based on the written appeal, defendants anticipated the possibility of litigation. Defendants' anticipation of litigation is also supported by the fact that, several days after receiving plaintiff's written appeal of the nonrenewal decision, Dean Campbell and Associate Dean Herzog each sought legal advice from FSU's in-house counsel. *See* ECF 62-6 (Throop Dep.) at 21–22 (including questions by plaintiff's counsel concerning the November 12 and 17, 2018, references to information for legal advice in defense counsel's "privilege log"). Although plaintiff is "not privy to the substance of those communications," it is notable that these requests for legal advice came from persons involved in plaintiff's nonrenewal appeal and occurred in the days surrounding his written appeal and subsequent meeting with both Campbell and Herzog. ECF 62-1 at 10. And, it implies that defendants reasonably anticipated the prospect of litigation. *See Steves & Sons, Inc.*, 327 F.R.D. at 106 (concluding that an e-mail describing steps to be taken in the event of potential retaliation was "compelling evidence" that plaintiff knew or should have known of impending litigation and "unquestionably thought" itself open to possible claims against it).

Moreover, "a sophisticated entity," like FSU, "should always recognize the possibility of a lawsuit when it terminates the employment of a professional." *Webster v. Psychiatric Med. Care, LLC*, 386 F. Supp. 3d 1358, 1363 (D. Mont. 2019).

Standing alone, a "'vague or far-off possibility' of litigation is insufficient to trigger the duty to preserve." *Id.* (quoting *Samsung Elecs. Co. v. Rambus, Inc.*, 439 F. Supp. 2d 524, 547 (E.D. Va. 2006), *vacated on other grounds*, 523 F.3d 1374 (Fed. Cir. 2008)). But, the circumstances in this case, taken as a whole, demonstrate that defendants reasonably anticipated litigation. Thus, in the context of this fact-intensive inquiry, *see In re Ethicon*, 299 F.R.D. at 512, I conclude that defendants' duty to preserve material evidence arose at the time plaintiff submitted his rebuttal letter in November of 2018.[11]

Therefore, the erasure of both cell phones occurred after the duty to preserve had been triggered. But, this determination does not end the spoliation inquiry.

## 2.   Culpability

The second element to consider is whether "the destruction or loss was accompanied by a culpable state of mind." *Goodman*, 632 F. Supp. 2d at 509. The Fourth Circuit has explained: "[S]poliation does not result merely from the 'negligent loss or destruction of evidence.' Rather, the alleged destroyer must have known that the evidence was relevant to some issue in the anticipated case, and thereafter willfully engaged in conduct resulting in the evidence's loss or destruction." *Turner*, 736 F.3d at 282 (quoting *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995)) (internal citations omitted).

---

[11] In a footnote, plaintiff also argues that "Frostburg State University had an obligation, wholly independent of this litigation, to have retained these texts under Maryland's Public Information Act." ECF 62-1 at 13 n.7. Because I have concluded that defendants were under a common law duty to preserve the cell phone data, I need not address this argument.

The scienter necessary to impose sanctions for spoliation of ESI is further clarified in Rule 37(e)(2). According to Rule 37(e), a court may only impose sanctions "upon finding that the party acted with the *intent to deprive* another party of the information's use in litigation." Fed. R. Civ. P. 37(e)(2) (emphasis added).

Of import, the evidence subject to spoliation in this case is ESI. In order to impose sanctions for spoliation with respect to ESI, there is a heightened standard of culpability. In *Fowler v. Tenth Planet, Inc.*, JRR-21-02430, 2023 WL 3569816, at *7 (D. Md. May 19, 2023), Magistrate Judge Coulson of this court aptly noted the recent shift in law as to spoliation of ESI:

> The Court pauses to emphasize the intent behind the most recent changes to Rule 37(e) in 2015 that created the exclusive analytical framework to be used in cases of alleged spoliation of ESI, such as the missing text messages at issue here. The pre-2015 caselaw on the authority for and availability of particular sanctions for spoliation of ESI and what level of intent sufficed lacked clarity and consistency. As the Advisory Committee makes plain, the 2015 amendments to Rule 37(e) were specifically designed to remedy that lack of clarity and consistency. Attempts at a wholesale reconciliation of pre-amendment jurisprudence with post-amendment Rule 37(e) risks a reinstatement of the ad hoc approach that the Advisory Committee sought to correct, where, under the talisman of "inherent authority," a court was free to grant or deny any potential sanction based on any state of mind from negligence to intentional bad faith. That said, it is certainly true (as some post-amendment cases point out) that some pre-amendment decisions approach ESI spoliation in a way consistent with current Rule 37(e), and such decisions remain helpful in applying Rule 37(e)(1) and (2). *See, e.g.*, *McCoy v. Transdev Servs., Inc.*, No. DKC-19-2137, 2021 WL 1215770, at *1–3 (D. Md. Mar. 31, 2021) (citing certain pre-amendment decisions as support for the application of post-amendment Rule 37(e)). However, to the extent that such pre-amendment cases are explicitly inconsistent with current Rule 37(e)—such as justifying dismissal or an adverse inference instruction on conduct falling short of a specific finding of intent to deprive—the Court no longer views them as persuasive in addressing spoliation of ESI.

This analysis is bolstered by the Advisory Committee Notes on the 2015 amendment of Fed. R. Civ. P. 37(e):

> Adverse-inference instructions were developed on the premise that a party's intentional loss or destruction of evidence to prevent its use in litigation gives rise to a reasonable inference that the evidence was unfavorable to the party responsible for loss or destruction of the evidence. Negligent or even grossly negligent

behavior does not logically support that inference. Information lost through negligence may have been favorable to either party, including the party that lost it, and inferring that it was unfavorable to that party may tip the balance at trial in ways the lost information never would have.

Accordingly, in order to impose sanctions for spoliation of ESI, the Court must conclude that defendants engaged in willful or intentional conduct. "Willfulness is equivalent to intentional, purposeful, or deliberate conduct." *Victor Stanley, Inc.*, 269 F.R.D. at 530 (citing *Buckley v. Mukasey*, 538 F.3d 306, 323 (4th Cir. 2008)). And, the burden is on the moving party to "demonstrate that the failure to preserve was motivated by an intent to deprive the moving party of the use of the information in the litigation." *Fowler*, 2023 WL 3569816, at *6 (citing *Brittney Gobble Photography, LLC v. Sinclair Broad. Grp., Inc.*, SAG-18-3403, 2020 WL 1809191, at *4 (D. Md. Apr. 9, 2020)). This is no simple task. As then-Magistrate Judge Grimm stated in *Victor Stanley, Inc.*, 269 F.R.D. at 516: "When the spoliation involves ESI, the related issues of whether a party properly preserved relevant ESI and, if not, what spoliation sanctions are appropriate, have proven to be one of the most challenging tasks for judges, lawyers, and clients."

In *Victor Stanley*, 269 F.R.D. at 531, the district court concluded that defendants "set out to delete, destroy, or hide thousands of files containing highly relevant ESI pertaining to Plaintiff's claims" based on its findings that defendants "lied about their ESI production; obstructed the discovery process; and intentionally destroyed evidence when they were aware of the lawsuit." *Id.* Specifically, the court noted that defendants "deleted thousands of files and ran programs to ensure their permanent loss immediately following preservation requests and orders, and immediately before scheduled discovery efforts," and that this was "compounded by their failure to comply with numerous court orders." *Id.*

Here, however, plaintiff has not provided any evidence that defendants deleted the contents of the cell phones with the intent to deprive plaintiff of any evidence contained therein. As far as

70

I can tell, plaintiff argues only that the data was improperly deleted, and that the intent element is satisfied by the experience and knowledge of Dr. Throop and FSU counsel with respect to litigation procedure.  *See* ECF 62-1 at 16–17 ("Considering the level of legal training and experience possessed by these persons, the University's purported 'standard operating procedure' of wholly erasing Dr. Throop's cell phone contents[ ] in June 2020 . . . should be scrutinized closely and construed as an intentional act by the Court.").[12]

Indeed, the substantial portion of plaintiff's argument appears to argue that that defendants failed to preserve evidence, rather than that they intentionally destroyed it.  *See* ECF 62-1 at 13 ("The undeniable fact is that Defendants had a duty to preserve this text evidence, and they did not.").  The conduct at issue, then, concerns defendants' failure to implement a proper litigation hold, rather than intentional destruction of evidence.  In general, courts have treated a failure to implement a litigation hold as constituting gross negligence.  *See McCoy v. Transdev Servs., Inc.*, No. DKC-19-2137, 2021 WL 1215770, at *3 (D. Md. Mar. 31, 2021) (finding that the defendant "was grossly negligent in failing to preserve ESI after a year of notice and actual knowledge of the ongoing litigation"); *Performance Food Grp., Inc.*, 2019 WL 1057385, at *6 ("When no litigation hold has been instituted, courts have found such conduct to be grossly negligent."); *Cognate BioServices, Inc. v. Smith*, No. CIV. WDQ-13-1797, 2015 WL 5158732, at *6 (D. Md. Aug. 31, 2015) (finding that defendant's "failure to institute a litigation hold . . . amounts to gross negligence" because "a reasonably prudent person in Smith's position would have instituted some sort of litigation hold.").

---

[12] I pause to note that plaintiff's memorandum in support of this Motion (ECF 62-1) weaves through its arguments without expressly indicating how those arguments fit into the standard it seeks to meet.  "Judges are not like pigs, hunting for truffles buried in briefs.'"  *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*, 42 F.4th 300, 315 (4th Cir. 2022) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

As the *Victor Stanley* Court noted, 269 F.R.D. at 526:

[A]n adverse inference instruction makes little logical sense if given as a sanction for negligent breach of the duty to preserve, because the inference that a party failed to preserve evidence because it believed that the evidence was harmful to its case does not flow from mere negligence—particularly if the destruction was of ESI and was caused by the automatic deletion function of a program that the party negligently failed to disable once the duty to preserve was triggered.

Thus, plaintiff has not carried his burden to demonstrate an "intent to deprive," pursuant to Rule 37(e)(2). *See Performance Food Grp., Inc.*, 2019 WL 1057385, at *5–6 ("[P]laintiff has not provided any evidence that defendant destroyed the paper applications 'for the purpose of depriving [plaintiff] of the evidence' or that defendant 'intended to destroy the evidence.' . . . Rather, plaintiff's arguments focus on defendant's failure to implement a proper litigation hold. Accordingly, I do not find that plaintiff has established that defendant acted willfully or in bad faith.") (internal citations omitted) (alteration in *Performance Food Grp., Inc.*).

Therefore, I shall deny plaintiff's Motion for Sanctions for Spoliation of Evidence (ECF 62).

## IV.   Conclusion

I shall grant in part and deny in part defendants' Summary Judgment Motion. ECF 55. Defendants failed to raise in their Answer the affirmative defense of failure to exhaust administrative remedies. For the reasons stated earlier, I shall deny their Motion to Amend the Answer (ECF 54). Nevertheless, plaintiff did not make the required showing of prejudice or unfair surprise necessary to implement defendants' waiver of the affirmative defense. Therefore, I shall grant summary judgment in favor of defendants as to Count V of the Complaint, which asserts a failure to accommodate claim under MFEPA. But, summary judgment is denied as to all other claims. And, I shall deny plaintiff's Motion for Sanctions (ECF 62) because plaintiff has not

demonstrated that defendants destroyed the material with the intent to deprive plaintiff of evidence, pursuant to Rule 37(e).

An Order follows, consistent with this Memorandum Opinion.


Date: June 27, 2023                                            _____/s/_____
                                                              Ellen L. Hollander
                                                              United States District Judge